**Dorothy WALLS, et al., Plaintiffs,**

**v.**

**MISSISSIPPI STATE DEPARTMENT OF PUBLIC WELFARE, et al., Defendants.**

**UNITED STATES of America, Plaintiff,**

**v.**

**MISSISSIPPI STATE DEPARTMENT OF PUBLIC WELFARE, et al., Defendants.**

**Nos. GC 73–5–WK, 75–108–WK.**

United States District Court, N. D. Mississippi, Greenville Division.

May 18, 1982.

---

Johnnie E. Walls, Jr., Greenville, Miss., Eugene Martin-Leff, New York City, for plaintiffs.

John Hailman, Asst. U. S. Atty., Oxford, Miss., Thomas E. Childs, Asst. Atty. Gen., Jackson, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In these consolidated complex employment discrimination actions, private plaintiffs and the United States challenge procedures of Mississippi public welfare officials for the selection of three classes of employees as racially discriminatory in violation of federal regulatory, statutory, and constitutional law. The issues of liability and relief were bifurcated on December 6, 1976, and, commencing July 5, 1978, District Judge Orma R. Smith conducted a ten-day nonjury trial on the liability phase, during which extensive testimony and voluminous documentary exhibits were received in evidence. The actions were transferred to Chief Judge William C. Keady on October 23, 1981, and are finally ripe for decision.[1] Accordingly, the court hereby submits its findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P.

## FINDINGS OF FACT

*GC 73–5*

Private plaintiffs' action was first instituted on January 15, 1973. After the filing of the second amended complaint on August 29, 1975, and entry of numerous court orders, the action now stands as follows.

Five plaintiffs, Dorothy Walls, Deborah Gambrell, Marlene Johnson, Julia Collier, and Emily Butler O'Bryant, all members of the black race, have been certified under Rule 23, F.R.Civ.P., to represent a class composed of "all black persons who did, or

1. The court feels obligated to explain the lengthy delay attendant these proceedings. Initially, the process of discovery, ordinarily burdensome in employment discrimination class actions, was made even more so by the fact that state defendants did not maintain data on the racial composition of applicants and employees, thereby necessitating alternate and cumbersome means of racial identification. The discovery process was further interrupted by the United States' complaint, filed more than two years after the *Walls* suit, and by what proved to be fruitless settlement negotiations, thus requiring numerous postponements of trial settings. After the trial was completed, the 2200-page transcript was not filed by the court reporter until June 17, 1980, or almost two years later. Briefing was not completed until November 1980. Meanwhile, Judge Smith's protracted illness in the summer of 1981 required transfer of the actions. All parties agree that the issues may be decided by this judge on the basis of the 1978 record.

will in the future, apply for employment in the position of Clerk (any grade), Eligibility Worker, or Social Worker (any grade) in the Mississippi State Department of Public Welfare or county departments of public welfare and who have been, or in the future may be, denied such employment or otherwise discriminated against in hiring or terms and conditions of such employment on account of race or color." [2]

Defendants include the Mississippi State Department of Public Welfare (hereinafter Department or MSDPW), its Commissioner and state board members, the Mississippi Classification Commission (formerly the Merit System Council; both agencies are hereinafter the state merit system agency), and the Leflore County Welfare Department and its director. The latter two defendants are certified to represent defendant classes of "all county departments of public welfare in the State of Mississippi and the County Directors of all such Departments." In addition, as required by order of the court dated August 11, 1975, plaintiffs sue as parties necessary for just adjudication the United States, United States Department of Health and Human Services (formerly Department of Health, Education and Welfare) and its Secretary, United States Department of Agriculture and its Secretary, and the United States Civil Service Commission (formerly Office of State Merit Systems) and its Chairman.[3] No relief, however, is sought against the federal defendants. All individual defendants are sued in official capacities only.

Private plaintiffs generally challenge three aspects of the Department's employment selection procedure: (1) use of minimum educational qualifications for positions of Clerk/Typist (high school degree or equivalent), Eligibility Worker (60 hours

**2.** The contested classes are defined by the Department as follows:

Social Workers are responsible for

"[S]emi-professional social work encompassing the full range of adult and child welfare services designed to strengthen, rehabilitate and preserve families and provide protection and care for children in need of supplementary or substitute care, or provide full-time intake services. Incumbents evaluate the social needs of adults and children, develop a plan directed toward the solution of individual and family problems and provide protective and placement services for homeless, dependent or neglected children. Incumbents develop and utilize all agency and community resources which will carry out the above objectives. Work is performed under the administrative supervision of the County Welfare Director of the county of assignment, and when working with children and families under the technical supervision of the Service Supervisor. Close supervision is received in the form of review of case work plan, recorded narrative and frequent case work conferences."

Eligibility Workers perform

"[R]outine work in determining the initial and continuing eligibility of applicants and recipients for welfare assistance and in providing other services related to the programs of county offices. Emphasis is upon the investigation and reporting of continued eligibility in public assistance categories and food stamps. Initial determination of eligibility is also performed at this level. Work is performed under the supervision of the Welfare Director or other superior to whom this function is delegated."

The position of Clerk/Typist has the following duties:

"[C]lerical work of a varied nature and typing duties such as typing letters, addressing envelopes, copying data from one record to another, filling in report forms, and typing routine or straight copy from rough or corrected drafts. Assignments are usually in accordance with well established procedures which require the exercise of judgment only in matters where mistakes would involve little loss to the department or unit served. Detailed instructions are usually given at the beginning of each work assignment, or with each subsequent new assignment. Supervision while performing on the job varies but is generally determined by the type of work assigned. The work is usually reviewed or checked upon completion. Incidental use of simple office equipment, other than the typewriter, requires only such proficiency as can be acquired from their use on the job. Work is performed under the supervision of a clerical worker in a higher classification or an administrator.

**3.** The individuals presently holding the office of the defendants originally sued are, of course, automatically substituted for those original defendants. F.R.Civ.P. 25(d)(1). In addition, the Department of Health and Human Services is automatically designated defendant in lieu of HEW, 20 U.S.C. § 3508 (1981 Supp.), and Office of Personnel Management in lieu of Civil Service Commission.

college credit), and Social Worker (college degree); (2) requirement of scoring at least 50% on allegedly unvalidated and invalid written examinations as a prerequisite to being considered for positions of Clerk/Typist,[4] Eligibility Worker, and Social Worker; and (3) the manner in which individuals meeting the above two requirements are selected for employment from "certificates of eligibles." According to the complaint, these employment procedures discriminate against blacks in violation of 42 U.S.C. § 1981, 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.), and the thirteenth and fourteenth amendments to the United States Constitution.

Plaintiff Dorothy Walls, spouse of counsel for private plaintiffs Johnnie Walls, meets the minimum educational qualification for positions of Eligibility Worker and Social Worker and took and passed both written tests in August 1971. Although interviewed and considered for employment several times, Walls was not offered a Department position until after this action was filed. Walls filed EEOC charges of discrimination on August 9, 1972, and October 12, 1972, and received right-to-sue letters on February 5, 1973, and June 18, 1973.

Plaintiff Deborah Gambrell possesses the minimum educational requirements for Eligibility Worker and Social Worker and took and passed the Eligibility Worker examination on October 16, 1971. Although interviewed and considered for employment more than 10 times, Gambrell was not offered a position until after this action was filed. Gambrell filed an EEOC charge of discrimination on October 12, 1972, and received right-to-sue letters on February 5, 1973, and June 18, 1973.

Plaintiff Marlene Johnson meets the minimum educational requirements for Eligibility Worker and Social Worker and took and

passed a written examination in October 1968, but did not score sufficiently high on that examination to be considered for employment.

Plaintiff Julia Collier possesses a high school degree and took and passed the Clerk/Typist examination on February 27, 1973. Although interviewed and considered for employment, Collier was never hired by the Department.

Plaintiff Emily Butler O'Bryant meets the minimum educational requirements for Eligibility Worker and Social Worker and took and failed both examinations in October 1971. Consequently, O'Bryant was never considered for employment.

State defendants assert a cross-claim against the Secretaries of the Departments of HHS and Agriculture and the Chairman of the Civil Service Commission, alleging that federal defendants required and/or encouraged use of the challenged employment procedures and further assured the state that the contested selection devices meet all federal regulatory, statutory, and constitutional requirements. The state officials seek injunctive relief against the federal Department heads requiring them to furnish valid examinations or technical, financial, and advisory assistance to enable the state to establish valid minimum job requirements. Furthermore, the state defendants seek to require cross-defendants to withdraw any federally-imposed selection devices found to be unlawful.[5]

*GC 75–108*

The action brought by the United States was filed on August 28, 1975, against the Mississippi State Department of Public Welfare, its Commissioner and board members, and the Mississippi State Classification Commission and its director, and generally presents the same three challenges asserted by private plaintiffs. A counterclaim filed

---

4. The typing proficiency test required of Clerk/Typist applicants is not at issue.

5. Jurisdiction of the cross-claim is alleged under 28 U.S.C. §§ 1331, 1346 and 1391 (mandamus) and 42 U.S.C. § 1985(2), for violations of Title VII, Title VI (42 U.S.C. § 2000d et seq.),

the Intergovernmental Personnel Act (42 U.S.C. § 4701 et seq.), Executive Orders 11764 and 11478, as amended by Executive Order 11590, 7 CFR § 15.1 et seq., and 45 CFR § 80 et seq. The aspects of the cross-claim seeking monetary relief were dismissed by the court.

against the United States was dismissed by the court on July 26, 1976. As defensive matter, however, defendants contend that the government is estopped from asserting its claims.

After the filing of the United States action, defendants, in November 1975, suspended utilization of written tests pending the outcome of these lawsuits.

*Background*

The Mississippi State Department of Public Welfare is the state agency created to administer within Mississippi the federal grant-in-aid programs established in the late 1930's by the Social Security Acts and amendments thereto. *See* Miss.Code Ann. § 43–1–1 et seq. (1972). The various social service programs administered by the Department include aid to dependent children, food assistance, and adoptions. The Department is responsible for, *inter alia*, providing protective custody for abused children, day care services for children of welfare clients, background investigations relative to adoptions, elderly feeding programs, counseling for unwed mothers, and family planning. At the time of trial, the Department had a budget of approximately $360 million and employed approximately 3,600 persons, about 80% of whom were employed in the contested positions of Clerk/Typist, Eligibility Worker, and Social Worker. The food assistance program alone provides aid to approximately 350,000 persons. Of the Department's total number of clients, about 70% are black.

The Department is governed by a state board of public welfare consisting of five members appointed by the governor with advice and consent of the Senate. § 43–1–3. The state board appoints a Commissioner of Public Welfare who serves at the board's pleasure and is responsible for the

general administration of the Department. Dr. Robert L. Robinson served as Commissioner from April 24, 1972, until May 25, 1973, when Max M. Cole assumed the duties of the office. On June 17, 1976, Cole became deputy commissioner for operations and was succeeded in the Commissioner's post by Fred W. St. Clair, who held the position at the time of trial.[6]

The Department has five regional offices throughout the state, located in Grenada, Brandon, Hattiesburg, Brookhaven, and Pontotoc. Most of the Department's employees, however, are employed in its 84 county offices.[7]

Approximately 75% of the Department's funding is received from federal sources. Receipt of these funds is contingent upon federal approval of state plans for management and distribution of the funds in compliance with federal regulations. Accordingly, each year the Department submits to the federal grantor agency (at all times pertinent hereto, HEW and the Department of Agriculture) for its approval a plan outlining its proposed use of federal monies. One of the federal conditions for funding is employment of individuals based on a merit system of personnel selection. The Department's implementation of its merit system is aided by the state merit system agency, an eight-member body ultimately responsible for enforcement of the merit system of employment required of the Department and other federally funded state agencies. George W. McCarthy served as the state merit system's director from 1964 until 1974. The Civil Service Commission supervises the state merit system agency and the Department to ensure compliance with federal merit regulations.

The challenged selection process may be briefly summarized.[8] Applications for em-

---

6. The present Commissioner is Donald Roark.

7. Each county has one county office of public welfare, and Bolivar and Chickasaw counties, which have two county seats, have two such offices.

8. Exempt from these requirements are employees hired under the Comprehensive Educational

Training Act (CETA) and individuals hired on an emergency basis; emergency appointments are valid only for 30 days. Employees hired since November 1975, when use of written examinations was suspended, have been employed as provisional employees, who do not have full benefit of a permanent employment status.

ployment are submitted to the state merit system, which conducts examinations throughout the state. Individuals satisfying all job prerequisites, i.e., possessing minimum educational qualifications and scoring 50% or better on the written examination, are ranked by the state merit system according to test score (i.e., person scoring the highest is first) on a register of persons eligible for the position in the county or counties where the applicant has indicated availability for employment. The ranking of names is required by the federal standards. The personnel department is notified by the county director or department head of a vacancy and requests the state merit system to issue a "certificate of eligibles" which, prior to 1976, consisted of the names of the top five individuals on the register for the particular position, ranked according to test score. After interviewing the applicants, the county director returns the certificate of eligibles, along with comments and usually a recommendation as to who should be employed, to the Commissioner of Public Welfare, who makes the official appointment. The Commissioner is ultimately responsible for the appointment of all Department personnel except the 84 county directors, who are appointed jointly by the Commissioner and Governor. *See* § 43–1–9. A recommendation by the county director for appointment of an individual is accorded weight by the Commissioner in making the appointment. At time of trial, the Department had never employed a black as county director.

*Affirmative Action and Recruitment Efforts*

Prior to 1971, the Department had a history of employing few, if any, blacks as clerk/typist, social welfare worker or eligibility worker. In recognition of that fact, at trial former Commissioners Robinson and Cole, as well as then Commissioner St. Clair, testified as to the initiation of affirmative action programs at the Department during their respective tenures.

Robinson testified that when he took office in April 1972, he "could see by looking around that there wasn't [sic] enough blacks on the staff and ... set about to do something about it." The Department's first affirmative action plan was drafted shortly thereafter and forwarded to HEW which, in a June 1 letter, commented on what it perceived as "real weaknesses," and made several recommendations. A formal plan, consisting of a two-page memorandum, was circulated on June 21, 1972, to all staff members, who were told that the Department must emphasize a "policy of non-discrimination within the practice of recruitment, training, promotion, retention, or any other personnel action."

The plan, which was to be implemented by county directors at the county level and the directors of personnel and training at the state level, provided that the Department, in conjunction with the state merit system office, would widely publicize recruiting by sending notification of examination dates to newspapers, state employment offices, radio stations, television stations, and junior and senior colleges. In addition, each county director was to maintain a mailing list of "individuals and organizations to whom receipt of notice of examination would result in the potential applicants being informed of such examinations." Mailing lists were to be forwarded to the state merit system for its use in all agency recruitment efforts. The affirmative action program also provided that all Department and state merit system recruitment literature would indicate that the agency is "an equal opportunity employer."

Since county directors were responsible for advertising job vacancies, the means employed varied, some directors utilizing only "word-of-mouth" efforts. County directors and department heads were directed to "utilize suitable judgment in the selection of applicants, based on factors closely related to the actual job itself."

The 1972 plan was submitted to HEW with an attachment which stated in part that the Department, in conjunction with the state merit system, would "review all

job specifications with particular emphasis on minimum requirements ... to insure that there are no requirements which would tend to eliminate any person who has competency to perform the duties from examination or consideration."

Although HEW approved the plan in November 1972, an HEW official wrote Robinson on March 29, 1973, expressing concerns with implementation of the program and suggesting revisions. The letter noted that the weaknesses pointed out in HEW's June 1, 1972, communication had not been addressed in the plan. HEW also expressed concern "about any real effort to investigate the reason for the number of complaints for the various local departments," and recommended:

1. appointment of a person to devote at least part time to development, implementation, and monitoring the affirmative action program;

2. development of a method of internal processing of complaints;

3. revision of the plan in accordance with HEW's June 1972 letter;

4. local and state implementation of the plan; and

5. incorporation of the plan's principles in on-going training programs.

HEW's suggestions were incorporated in a revised affirmative action plan dated May 10, 1973, which set a goal of employing thirty minorities between July 1, 1973 and December 31, 1973; established an internal mechanism for handling applicant and employee complaints of discrimination; stated that training programs would be available to all employees regardless of race and that such programs would include in their agendas the affirmative action program; and assigned to the Department's Deputy Commissioner for Administration a part-time Equal Employment Opportunity Officer to coordinate the affirmative action plan, collect statistical and informational data concerning implementation of the plan, work with various Department divisions to en-

sure successful operation of the plan, and advise the Deputy Commissioner on possible revisions and updating of the plan.

Robinson emphasized the affirmative action plan at monthly meetings with county directors. Director of Personnel Margaret Jackson, who in June 1972 had refused to allow NAACP officials to review the affirmative action plan or discuss it with her, was given the responsibility of coordinating the program at the state level.

Robinson was of the opinion that a significant increase in black employment would take from three to five years. During the first year of the Department's affirmative action plan, i.e., from July 1972 to June 1973, blacks were employed in 20 of 285 Eligibility Worker appointments (7%); 19 of 206 Clerk/Typist appointments (9%); and 2 of 24 Social Worker appointments (9%). In deciding who to appoint to a position, Robinson, who rarely interviewed prospective employees, considered the individual's test score and county director's recommendation, as well as information secured from independent sources.

Former Commissioner Cole, who took office in May 1973, testified that affirmative action efforts were intensified during his term. He stressed the importance of the subject through staff meetings and memoranda. In August 1973, however, after the Civil Service Commission's annual EEO survey, it noted in a letter to the state merit system director McCarthy that "[t]he Department needs to concentrate its efforts in increasing the number of minorities employed at all levels of the agency."

On November 10, 1973, Cole circulated a memorandum that the Department had met the goal of employment of 30 minority individuals from July 1 to December 31, 1973. In fact, from July 1 to the date of the memorandum, 31 blacks had been hired and five minorities had been promoted. He also notified regional administrators and county directors that the Department was in the process of reorganization which required review of all class specifications to determine

if the minimum requirements then existing were proper and appropriate. Furthermore, a mailing list had been developed and was being used by the merit system in all recruitment campaigns; the recruitment literature included the phrase "An Equal Opportunity Employer." Cole transmitted another memorandum on June 24, 1974, advising that since November 10, 1973, 42 blacks had been appointed. Of this number, 14 were in the Clerk/Typist category, and 17 Eligibility Workers. Additionally, three blacks received promotions during the same time period.

In 1975 Cole appointed Billie Sims, a black female, to the newly-created position of Equal Employment Opportunity technician to promote affirmative action by contacting minority groups and making recruitment visits to predominantly black colleges. Sims wrote to previously qualified blacks whose names had been removed from registers, asking them to contact her if they were still interested in employment and stating: "We are giving priority to those persons having previously qualified for these positions with the Department of Public Welfare whose names have been removed from the register. . . . Every effort will be made in trying to get you employed." Effective September 1975, the Department instituted a policy of notifying persons scoring less than 75% on examinations that they could retake the test within 60 days.

As commissioner, Cole gave weight to the county director's recommendation in appointing individuals, but accorded little consideration to a person's rank on a certificate of eligibles.

Upon his appointment as commissioner on June 17, 1976, St. Clair became aware of the need to hire more blacks and personally assumed the responsibility for minority recruitment. He required county directors to submit monthly reports indicating blacks and whites hired and, Sims having been promoted to supervisor, appointed Patricia Greene as equal employment opportunity coordinator, a position under the direct supervision of personnel director Lorraine Winstead. St. Clair admitted that Margaret Jackson, personnel director until 1976, did not have his confidence in promoting the affirmative action plan. In late 1976 or early 1977, the mailing list used to announce job vacancies was expanded so that approximately 1,000 announcements were mailed by the state merit system office to various individuals and groups, and news releases for vacancies were utilized. St. Clair endeavored to stress the need for minority hiring at staff meetings held three times a year with all county directors. In appointing individuals to positions, St. Clair gave no weight to a person's rank on the certificate of eligibles.

*Workforce Data*

Notwithstanding the foregoing affirmative action efforts, the Department's employee composition indicates that no real gains in minority employment were made until 1976, after suspension of written examinations. According to 1970 census data, blacks then comprised 29.6% of Mississippi's total labor force. Moreover, it is indisputable that the percentage of blacks applying for positions in contest equals, if not exceeds, the percentage of blacks in the labor force. The following table depicts the Department's workforce composition, including positions of Social Worker I (SWI), Eligibility Worker (EW), and Clerk/Typist (CTI–III) from 1971 until 1978.

| | | MSDPW WORKFORCE | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Total | | | | SWI | | | | EW | | CTI–III | |
| Date | Workers* | % W | | % B | | % W | | % B | | % W | % B | % W | % B |
| June 1971 | 1,457 | 99 | | 1 | | 99 | | 1 | | 99 | 1 | 99 | 1 |
| Jan. 1973 | 2,022 | 98 | | 2 | | 99 | | 1 | | 96 | 4 | 97 | 3 |
| Jan. 1976 | 1,813 | 88 | | 12 | | 95 | | 5 | | 84 | 16 | 93 | 7 |
| July 1978 (approx.) | 3,600 | 74 | | 36 | | 83 | | 17 | | 77 | 23 | 88 | 12 |

* All data on total number of workers, except 1978 figures exclude persons employed in positions of Janitor, Maid, Homemaker, and Teacher's Aide. Although not in the trial record, the court has been advised that (1) as of September 1980, 31.7% of the Department's employees were black, while the percentage of blacks in the Social Worker, Eligibility Worker, and Clerk/Typist positions were 28.9, 35.3, and 18.4, respectively, and (2) as of April 1982, blacks comprised 32.9%, 40% and 23% of social workers, eligibility workers, and clerical workers respectively.

Plaintiffs' expert statistician, Dr. Peter Kolesar, testified with regard to the statistical significance of the degree of black underrepresentation in the Department's employ for all years shown above except 1978. It is uncontradicted in the evidence that a statistician rejects a hypothesis of neutral selection whenever the confidence level, based on statistical analyses, is 95% or better, which means that there are only five chances in 100 that the difference between white and black selections is attributable to chance. For the years 1971, 1973 and 1976, a comparison of Mississippi's black labor force of 29.6% to the Department's workforce indicated that the degree of underrepresentation of blacks was statistically significant at a confidence level of 95% or better in practically all positions; furthermore, the underrepresentation of blacks in the positions of Social Worker I, Eligibility Worker, and Clerk/Typist I was statistically significant at the 99% confidence level for all three years, i.e., there was only one chance in 100 that the low number of blacks employed in those positions was attributable to chance.

Kolesar also analyzed the number of blacks hired in positions of Social Worker I, Eligibility Worker, and Clerk/Typist I–III by the Department in 1972, 1973 and 1975 (1974 data was not available). The following table depicts the hires made in those years in contested classes.

| | | MSDPW HIRES IN CONTESTED CLASSES | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | | | | SWI | | | | EW | | CTI–III | |
| Years | Total # | % W | | % B | | % W | | % B | | % W | % B | % W | % B |
| 1972, 1973 & 1975 | 1,291 | 90 | | 10 | | 92 | | 8 | | 90 | 10 | 91 | 9 |
| 1973 & 1975 | 943 | 89 | | 11 | | 90 | | 10 | | 88 | 12 | 90 | 10 |

Again comparing these figures to the 29.6% black labor force, Kolesar concluded that the shortfalls in the number of blacks hired in the contested positions was statistically significant at the 99% confidence level. The same result was reached by looking only at offers of probationary and temporary appointments from January 1, 1973, to October 31, 1974, and comparing this data to the number of black applicants taking examinations between May and October 1975. This evidence is unchallenged.

As of January 1973, when private plaintiffs filed their action, 32 of the Department's 84 county offices did not employ a black, while 20 other county offices had a black employed only in the position of

"homemaker," essentially a housekeeping job.

*The Education Requirement*

The Department requires a college degree for Social Workers, two years (60 hours) of college for Eligibility Workers, and a high school diploma or its equivalent for Clerk/Typists. As of 1970, 14.9% of Mississippi's blacks and 52.6% of whites, 25 years of age or older, completed high school, while 3.7% of blacks and 10.0% of whites possessed a college degree. At the time of filing suit, private plaintiffs had attained the minimum educational requirement for the position(s) for which they applied.

Although federal standards once required minimum educational requirements for certain positions, these mandatory restrictions were deleted in 1970; since that time the responsibility for determining appropriate educational qualifications has rested with the Department. In August 1973, the Civil Service Commission recommended that the Classification Commission reevaluate its college degree requirement for Social Workers and "explore the propriety of establishing valid requirements which include substitution of appropriate experience for formal education where valid." At the same time, there was a recommendation for a partial merger of Eligibility Worker and Social Worker positions. As stated:

> The Eligibility Worker and Social Worker I positions were reviewed and found to have similar statements of duties. The minimum qualification requirement for Eligibility Worker is "successful completion of two years of college (60 or more semester hours) in an accredited college or university" and provides for no substitutions. The minimum qualification for Social Worker I is "graduation from a four-year college or university" with no substitutions. The first portion of this test for both positions is the same. There is an additional set of questions for the Social Worker I position. In view of the preceding, it is recommended that these positions be reevaluated and a determination made relative to the possibility of the Eligibility Worker position being used as

the entrance level position and access to the Social Worker I position by both original appointment and promotion.

To justify its use of minimum educational requirements in the contested classifications, the state officials at trial relied upon the functions performed by persons in those positions.

Social Workers handle child neglect and abuse cases and are therefore required to work within the state court system. They are also involved in providing services to adults. Former county director and Commissioner Cole testified:

> [T]heir work involves great detail because they are dealing with the human feelings of individuals, and it takes a very sensitive type of person ... The more know-how they have the better equipped they are to carry out their job and their responsibilities. They have to develop a plan for each person that comes before them, set that plan up, show a short range goal, a long range, and have all that recorded. And they are scrutinized by their individual supervisor, as well as reports furnished to the supervisor in the field office and also in the state office in Jackson.

An Eligibility Worker interviews clients, assists them in completing applications, and determines the client's eligibility for assistance. The latter requires knowledge of various federal regulations and policies. Furthermore, the worker must refer applicants to community resources and other avenues for benefits. As described by Cole, an Eligibility Worker must be "doctor, lawyer, indian chief in order to carry out their responsibility on a day to day basis." However, manuals necessary for determining eligibility are available at each county office, and the Department provides training sessions for incoming Eligibility and Social Workers covering all major areas of duties, and does not expect persons hired in those positions to have knowledge of the various procedures before undergoing training.

The Clerk/Typist acts as receptionist and is usually the first person a client meets upon entering the office. She fills out a

data card including client identifying information, transcribes intake interviews, and performs typing and filing duties. This individual, according to Cole, must be "kind, gentle, and understanding of the individual and also expedite that individual's time from the waiting room into the intake office so they can be seen without a long delay."

Cole, professing strong belief in education, testified that "every Social Worker should have a college degree ... [T]he more education that individual has the better treatment and more prompt service that a client receives." Cole also thought that Eligibility Workers should have a college degree, rather than the two-year college requirement, because of the complexity of federal regulations and because of the need to "get along with the client ..., with their fellow workers, ... [and] other agencies within the state."

As to the minimum high school diploma requirement for Clerk/Typist workers, Cole stated:

I sincerely believe that they should have a high school education for one basic reason, because in high school you usually are required to have at least three or four years of English, you are required to have at least one or two years of typing. The better the individual is with English and typing and with other related high school courses the better Clerk they are going to make.

... [T]he more educated the individual is the better job they are going to do. The clerk has to type, file, answer the phone, and many times they are one of the most responsible individuals within the office, to keep an office going when there is absence in the area of Social Workers or Eligibility Workers, or even sometimes when the Director is out.

Plaintiffs do not contradict the foregoing description of the work performed by these department employees.

*Use of Examinations*

The original examinations for the Clerk/Typist and Social Worker positions were received from the Civil Service Commission by request of the state merit system office, which request included class specifications for the position for which the test was being sought with a description of job duties, minimum educational or experience qualifications, and the knowledges, skills, and abilities considered by the Department to be necessary to successful job performance. The test for the Eligibility Worker position, however, was not received from the Civil Service Commission, but was developed by the state merit agency from questions, largely taken from Social Worker examinations, provided by the Civil Service Commission. Most examinations consist of 120 multiple choice items with four possible answers. Ninety items in the Social Worker and Eligibility Worker tests are identical.

The Civil Service Commission maintains an examination unit which prepares the majority of test items, although some are prepared independently under contract. The item writer is selected on the basis of knowledge in the field for which the item is to be used, e.g., social workers usually prepare social worker test items. Items are coded by type and level of difficulty and placed into blocks of similar items. Except for random deletion of some questions to limit the number of test items, the state merit system never changed the content of examinations received from the Civil Service Commission.

Former state merit system director McCarthy testified that, after attending an item writing seminar in Washington, D. C., he was convinced that these tests were the best ones available for use. As early as 1971, however, the Civil Service Commission and McCarthy were aware that the tests had a disparate impact on blacks. When a request for examination materials was returned in May 1973 for insufficient class specification data, McCarthy talked with federal officials regarding a validation study. Department employees completed questionnaires concerning job duties, and sent this data to Civil Service's Atlanta regional office which neither completed the

study nor countermanded or advised against the continued use of the examinations.

The use of written examinations for employment selection was once federally required, though this was not true after 1970. The criteria was then somewhat modified. At all times pertinent, the federal standards for merit selection provided as follows:

Selection for entrance to the career service will be through open competition. The selection process will maximize reliability, objectivity, and validity through a practical and normally multipart assessment of applicant attributes necessary for successful job performance and career development. Applicants will meet the minimum requirements of the job class. The parts of the total examination will consist, in various combinations as appropriate to the class and to available manpower resources, of such devices as work-sample and performance tests, practical written tests, individual and group oral examinations, ratings of training and experience, physical examinations, and background and reference inquiries.

In August 1973, the Civil Service Commission recommended that the state merit system reevaluate its examination process to include, as well as written tests, a rating of training and experience and, where practical, use of oral examinations.

According to Civil Service Commission officials, the state had the responsibility of determining what type of written tests should be used. A cover letter attached to examinations sent from the federal agency stated, "[i]t is intended that you review the suggested examinations for use appropriate to your needs, in accordance with applicable Federal standards." These same officials acknowledged that the only practical alternative to using federally developed tests, furnished to a state without charge, was to develop its own tests after a costly and timeconsuming validation process. Accordingly, the Civil Service officials had reason to believe that the Mississippi state agencies would rely upon their examinations without material change. Hence, McCarthy, acting on the assumption that the examinations supplied by the federal government to the state were "good tests," felt no concern that they could not be legally administered.

Plaintiffs' expert statistician analyzed results from persons taking examination in the contested classes from May to October 1975. Significant differences existed in the mean test scores for blacks and whites passing the examination: for the Social Worker examination, whites passing the test averaged 84.73 and blacks 76.41; for Eligibility Worker, whites averaged 79.47 and blacks 74.40; for Clerk/Typist, whites averaged 89.02 and blacks 78.76. Furthermore, the white-pass rate was significantly higher than the black-pass rate: for the Social Worker test, the white-pass rate was 148% of the black-pass rate; for Eligibility Worker, 183%; and for Clerk/Typist, 136%.

Kolesar also compared the actual number of blacks and whites passing and failing the examinations to the number of blacks and whites passing and failing one would expect if the examination process had equal impact. The following table illustrates his finding in this regard.

| | MSDPW TEST RESULTS: MAY–OCT 1975 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total Examinees | | Actual # Passing | | Expected # Passing | | Actual # Failing | | Expected # Failing | |
| Position | W | B | W | B | W | B | W | B | W | B |
| Soc. Worker | 207 | 185 | 205 | 124 | (173) | (155) | 2 | 61 | (33) | (30) |
| Elig. Worker | 235 | 206 | 213 | 104 | (168) | (147) | 22 | 104 | (67) | (59) |
| Clerk/Typ. | 186 | 78 | 179 | 55 | (165) | (69) | 7 | 23 | (21) | (9) |

Thus, Kolesar's statistical computations regarding the above testing data indicated that the differences between all black and white examination results were statistically significant at the 99% confidence level, or sufficient to cause a statistician to reject the hypothesis that the tests had equal impact on whites and blacks. This statistical evidence stands unchallenged in the record.

*Validation Studies*

As previously noted, the Department in November 1975 suspended the use of written examinations in the three contested classifications. In the fall of 1977, the state merit system office retained a Jackson consulting firm to conduct a validation study of these examinations. This study, begun in January 1978, consisted of two distinct components: a content validity aspect performed by David Morris to determine the relationship between the tests and job tasks, and a criterion validity portion performed by Max McDaniel to ascertain the relationship between job performance and test scores.

*Content Validity*

The first step in the content validity study sought to determine which tasks were necessary for successful performance of job duties in the contested positions. Based on interviews with three job incumbents in each position and job descriptions of the positions prepared by public welfare officials, Morris developed lists of task statements and knowledges, skills, and abilities needed for each job. These task statements were given to approximately twenty incumbents in each position to verify if the task was actually performed, how much time was devoted to it, whether it was critical to job performance, and whether knowledge of the task was necessary at job entry. The list of knowledges, skills, and abilities (KSAs) was given to the same incumbents to rate whether unnecessary, desirable, necessary at full performance, or necessary at entry. Incumbents also ranked tasks and KSAs in order of their importance on the job.

After receiving responses from incumbents, Morris reviewed the tests and clustered examination items according to similarity, e.g., one section dealing with vocabulary, one with mathematics, etc. Next, two Education professors in predominantly black state universities with Ph.D. degrees in psychology reviewed the tasks and KSAs to determine which related to any test subpart (e.g., vocabulary). These "judges" had no experience in social work, clerical skills, or vocational psychology. Individual test questions were not reviewed to determine if they in fact bore a relationship to any task or knowledge; rather, if both "judges" concluded that a KSA or a task statement related to a test subpart, that subpart was found to have content validity. Morris' final conclusions were that all examinations for the contested classes had content validity since the test subcategories were viewed as related to at least one KSA identified with the position. Summaries of the results regarding the individual examinations follow.

(a) *Clerk/Typist Examination.*[9]

Nineteen incumbents, five of whom were supervisors, were asked to determine the importance of 20 tasks and 27 KSAs. Only one of the 20 tasks reviewed was considered by as much as 50% of employees to be necessary at entry.[10] Two other tasks were

---

**9.** Passing the Clerk/Typist I examination allows persons to be eligible also for positions of Clerk/Typist II and III, provided they have a certain amount of job experience.

**10.** Incumbents were asked to rank the necessity of the various tasks and KSAs upon entry by marking one of the following:

(1) Unnecessary: not required to perform any aspect of this job;

(2) Desirable: not required but if present is likely to contribute to superior performance and/or advancement potential;

(3) Necessary at full performance: required in order to adequately perform basic job tasks, but can be and/or usually is gained through some form of training after entry;

(4) Necessary at entry: required at the time of entry into this job in order to adequately perform basic job tasks including occasional tasks that are critical.

Thus, only a rating of (4) indicates that the knowledge or task is necessary at entry.

found by 42.1% as necessary at entry, while no other task was deemed to be necessary at entry by more than 26.3% of incumbents. In addition, 10 of the 27 KSAs were considered by at least 50% of incumbents to be necessary at entry, and six others were viewed by between 40 and 50% as so necessary.

Two different written examinations (Form A and Form B) were used to test potential Clerk/Typists during the relevant time period. Both forms consisted of the following eight subparts: English Grammar (constituting 8% of the examination); Graph Reading Ability (17%); Vocabulary (17%); Basic Math (17%); Alphabetical Filing (8%); Office Procedure (8%); Spelling Ability (17%); and Punctuation Ability (8%).

The following table depicts the number of total tasks and KSAs viewed by the professors as related to a test section, as well as the number of related tasks and KSAs which were found by more than 50% and 40% of incumbents to be necessary at entry.

CLERK/TYPIST EXAMINATIONS:
RELATIONSHIPS TO TASKS & KSAs

| Test & Subpart | # Tasks Related | | | # KSAs Related | | |
|---|---|---|---|---|---|---|
| | Total | 50%+ | 40%+ | Total | 50%+ | 40%+ |
| FORM A | | | | | | |
| Eng. Grammar | 4 | 0 | 1 | 5 | 4 | 5 |
| Graph Reading | 3 | 0 | 0 | 3 | 2 | 3 |
| Vocabulary | 5 | 0 | 1 | 8 | 5 | 7 |
| Basic Math | 1 | na | na | 2 | 0 | 1 |
| Alph. Filing | 6 | 0 | 0 | 1 | 1 | 1 |
| Office Pro. | 8 | 1 | 2 | 7 | 3 | 6 |
| Spelling | 8 | 1 | 2 | 3 | 2 | 3 |
| Punctuation | 3 | 0 | 1 | 3 | 2 | 3 |
| TOTAL FORM A* | 16 | 1 | 3 | 16 | 9 | 14 |
| FORM B | | | | | | |
| Eng. Grammar | 4 | 0 | 1 | 4 | 4 | 4 |
| Graph Reading | 3 | 0 | 0 | 5 | 2 | 3 |
| Vocabulary | 5 | 0 | 1 | 7 | 4 | 6 |
| Basic Math | 1 | na | na | 2 | 0 | 1 |
| Alph. Filing | 5 | 0 | 0 | 1 | 1 | 1 |
| Office Pro. | 8 | 1 | 2 | 13 | 5 | 9 |
| Spelling | 8 | 1 | 2 | 3 | 2 | 3 |
| Punctuation | 3 | 0 | 1 | 3 | 2 | 3 |
| TOTAL FORM B* | 16 | 1 | 3 | 19 | 9 | 14 |

"NA" - not available.

* Since the same tasks and KSAs were found to relate to more than one test subpart, totals for the two forms do not equal the total of the columns.

As shown by the above table, two sections in both examinations, Basic Math and Alphabetical Filing, together constituting 25% of the tests, bore relationships to only one KSA each that was found by more than 40% of incumbents to be necessary at entry.

(b) *Eligibility Worker Examinations.*

Twenty incumbents, 10 of whom were supervisors, rated the importance of 23 task statements and 73 knowledges, skills, and abilities proposed to relate to the position of Eligibility Worker. No task statement was viewed by more than 20% of incumbents as necessary at entry. Furthermore, only 18 of the 73 KSAs (or 25%) were judged by at least 50% of incumbents to be necessary at entry, while an additional four KSAs were viewed by between 40 and 50% of employees as so necessary.

The Eligibility Worker examination consisted of nine subparts: Economics (consti-

tuting 9% of the test); Governmental Aspects (17%); Vocabulary (16%); Basic Math (4%); Graph Reading Ability (15%); Sociological Aspects (15%); Public Relations and Interviewing Skills (8%); Specific Governmental Aspects Relating to the Welfare Agency (11%); and Reading Comprehension (4%).

Significantly, no relationship was found between three test subparts (Economics, Governmental Aspects, and Specific Governmental Aspects Relating to the Welfare Agency), together constituting 37% of the examination and any task or KSA viewed by more than 20% of incumbents as necessary at entry. Furthermore, although a relationship was found between 44 of the 73 KSAs and some section of the examination, only 12 of these were viewed by at least 50% of incumbents as necessary at entry, while an additional two were found by between 40% and 50% of employees to be so necessary.

(c) *Social Worker Examinations.*[11]

Twenty incumbents, ten of whom were supervisors, rated the importance of 19 task statements and 104 KSAs purported to be necessary for performance of Social Worker duties. No task statement was viewed by more than 25% of employees as necessary at entry. Moreover, only 25 (or 24%) of the KSAs were determined by at least 50% of incumbents to be necessary at entry, while an additional two were so viewed by between 40% and 50% of employees. Four different examination forms (A, B, C and D) were used during relevant times as a selection device for the Social Worker position.

Form A of the Social Worker test consisted of seven subparts: Economics and Governmental Aspects (constituting 21% of the examination); Vocabulary (8%); Graph Reading and Basic Math (8%); Graph Comprehension Ability (4%); Social Work Knowledges and Abilities (17%); Social Science Aspects (17%); and Public Relations and Interviewing Skills, Welfare Agency Aspects (25%). A relationship was found between some test section and 36 of the 104 KSAs (34%), although only 12 of these were viewed by at least 50% of incumbents to be necessary at entry. The Economics and Governmental Aspects category did not bear a relationship to any task statement or KSA determined by more than 30% of incumbents to be necessary at entry.

The Social Worker examination Form B consisted of six sections: Economics and Governmental Aspects (constituting 21% of the test); Vocabulary (8%); Graph Reading and Basic Math (8%); Graph Comprehension Ability (8%); Social Work Knowledges and Abilities (33%); and Public Relations and Interviewing Skills, Welfare Agency Aspects (21%). A relationship was found between some subpart of this examination and 39 of the 104 KSAs, only 12 of which were viewed by at least 50% of incumbents to be necessary at entry. Two sections of the test (Economics and Governmental Aspects; Vocabulary), together constituting 29% of the examination, were found to relate to only one KSA found by at least 50% of incumbents to be necessary at entry, and that KSA was "professionalism—ability to transmit the air of a professional Social Worker and assume role of authority."

Form C of the Social Worker Test consisted of six subparts: Economics and Governmental Aspects (constituting 21% of the examination): Vocabulary (8%); Graph Reading and Basic Math (8%); Graph Reading Ability (8%); Sociological Aspects, Social Work Knowledges and Abilities (33%); and Public Relations and Interviewing Skills, Welfare Agency Aspects (21%). A relationship was found between test categories and 45 of the KSAs, 15 of which were viewed by at least 50% of incumbents to be necessary at entry, and one more was so viewed by 45%. The only KSA relating to Economics and Governmental Aspects section found by at least 50% of incumbents to be necessary at entry was "professional-

11. Passing the Social Worker I examination qualifies an individual to be placed on the Social Worker II register provided he has one year of graduate school credit. A different test is used for the Social Worker III position.

ism." Furthermore, the only KSAs relating to the Public Relations and Interviewing Skills, Welfare Agency Aspects subpart and viewed by at least 40% of incumbents to be necessary at entry are what may be described as "personal characteristics" (ability to deal with hostility; objectivity; professionalism; integrity and honesty; ability to relate to and accept people from a broad range of backgrounds; patience; respect for individuality of others; empathy and sensitivity; self-knowledge; flexibility; and ability to function under stress).

The Social Worker examination Form D differed somewhat from the other forms in that it included 135, and not 120, questions, and included the following sections: Economics and Governmental Aspects (constituting 11% of the test): Reading Comprehension (7%); Organization of Material (4%); Vocabulary (8%); Graph Reading Ability (4%); Graph Reading and Basic Math (8%); Public Relations and Interviewing Skills (10%); and Sociological and Welfare Agency Aspects (48%). A relationship was found between some subpart and 49 of the KSAs, only 11 of which were viewed by at least 50% of incumbents to be necessary at entry. Only one KSA (ability to relate to and accept people from a broad range of backgrounds) relating to the Economics and Governmental Aspects section was viewed by at least 50% of incumbents as necessary at entry, and no KSA relating to Organization of Materials was viewed by more than 25% of incumbents to be necessary at entry. Furthermore, only four KSAs relating to the Sociological and Welfare Agency Aspects subpart, constituting almost one-half of the total examination, were determined by at least 50% of incumbents to be necessary at entry, and these KSAs are what may be described as "personal characteristics" (objectivity; professionalism; ability to relate to and accept people from a broad range of backgrounds; and respect for individuality of others).

(d) *Plaintiffs' Criticisms of Content Validity Study.*

Plaintiffs' testing experts took issue with the methodology employed in the content validity study. Noting that in effect incumbents were given a list of task statements and told they were relevant to their job, Dr. Brent Baxter stated that a better procedure would be to allow incumbents to formulate their own lists of tasks necessary to adequate job performance. He also pointed out confusing instructions given employees. For example, incumbents were told "if you have a very specialized job try to answer the question more in terms of the job as it is usually done, as it is done by most of the people who do that job, or in terms of the various specialties," thus allowing a choice of three ways in which the question might be answered. Baxter also questioned the way in which tasks and KSAs were framed. For example, task statement # 4 for Social Workers was as follows:

> Investigates complaints of neglect or abuse with a helping approach by obtaining as much information as possible on initial referral, assessing whether information indicates the child is in immediate danger, inspecting the premises, interviewing with guardians, and observing the child for signs of abuse; makes an appropriate plan to help protect children which may involve part or all of the following: Filing a report, periodic visits to see the child and family, referrals to family services, mental health center, parents anonymous, social summary, looking for a possibility among relatives, and termination of parental rights.

Because the task included so many different areas, 83 KSAs were determined necessary for its fulfillment. In addition, KSAs were broadly framed (e.g., knowledge of general governmental aspects, knowledge of general economic aspects, knowledge of general sociological aspects) and some were actually personal characteristics rather than true knowledges (e.g., self-acceptance, emotional stability, flexibility). As noted by Baxter, "you would almost be forced to say that somebody ought to know something about those things on every job." This expert was of the view that the large extent of the professors' disagreement con-

cerning whether tasks or KSAs related to an examination subpart was due to the broadness of the task and KSA definitions, and concluded that the validity study could not be used to determine that test questions related to performance of essential tasks on the job.

Dr. Joel Lefkowitz echoed Baxter's concerns with the validity study and concluded that there was insufficient evidence to establish the content validity of the examinations, noting:

> To say that each test area ... was related to an ability or knowledge really overlooks the fact that you are over-generalizing ... many test items being justified by perhaps a very few ability statements, irrespective of the importance of those ability statements, irrespective of whether or not they are needed at entry, irrespective of how vague and general they are, and so general as to apply to any employee ... in any situation.

*Criterion Validity*

A criterion validity study, prepared by Dr. McDaniel, was used to determine the degree of relationship between test scores and a measure of job performance. From task statements used in the content validity study, rating dimensions for job performance were prepared to be used by employees' supervisors to rate an incumbent's job performance on a 1 to 9 scale, a rating of 4 being average. Including one "overall" dimension on which supervisors were asked to rate employees' overall performance, Clerk/Typists were rated on 14 dimensions; Eligibility Workers on 15; and Social Workers on 11 dimensions. The samples of incumbents used for the study consisted of 161 Clerk/Typists (37 black and 124 white); 222 Eligibility Workers (78 black and 144 white); and 134 Social Workers (32 black and 192 white). All employees selected for this study had been employed after use of examinations as a selection device had been suspended.

A few days after supervisors' rating were completed and returned, they were asked to re-rate employees based on the same dimen-

sions in order to ensure reliability of the first rating. Upon completion of this step in the study, job incumbents were then tested with all examinations relevant to their positions. The tests were scored by the Classification Commission, and McDaniel correlated the results, which follow.

(a) *Clerk/Typist.*

Blacks scored lower than whites on the overall performance dimension (average black rating was 5.81 and white 6.31) as well as on the mean performance ratings, i.e., the average of all dimensions other than the overall dimension (black mean rating 5.67 and white 6.09). The difference in the overall rating was statistically significant at the 95% confidence level, although the difference in mean ratings was not. The difference between black and white test scores was also statistically significant at the 95% confidence level—blacks scored 70.11 on the Clerk/Typist Form A test and whites 85.85; and blacks scored 81.03 on the Form B examination, whites scoring 90.98.

Test scores on both forms were found to have a positive relationship, significant at the 95% confidence level, to seven of the thirteen (other than "overall") job dimension ratings, while an additional relationship, marginally significant at the 90% confidence level, was found for the Form B test.

Only one of the task statements from which Clerk/Typist job dimensions were derived was viewed by as much as 50% of incumbents to be necessary at entry; two others were viewed by 42.1% of incumbents as so necessary.

(b) *Eligibility Worker.*

Differences between black and white overall and mean ratings by supervisors were not statistically significant, although the difference in average test scores (66.41 for blacks, 82.49 for whites) was statistically significant at the 95% confidence level.

Unlike the analyses concerning Clerk/Typist and Social Worker positions, McDaniel concluded that the sample size of

Eligibility Workers was large enough to conduct a differential validity study to determine whether the test was a valid indicator of job performance for whites and blacks alike.

A correlation of white rating and test scores indicated a positive relationship, statistically significant at the 95% confidence level, for seven of the 14 dimensions, and an additional dimension marginally significant at the 90% level. As to black incumbents, fewer positive relationships were found between test scores and performance ratings. A correlation statistically significant at the 95% confidence level was found between test scores and only three of 14 job dimensions, while six additional dimensions were marginally significant at the 90% confidence level.

None of the task statements from which Eligibility Worker job dimensions were derived was viewed by more than 20% of incumbents to be necessary at entry.

*(c) Social Worker.*

Whites were rated higher than blacks on the overall ratings, and this difference was statistically significant at the 95% confidence level. Whites also scored higher on the mean ratings, but not significantly so. The differences between white and black test scores were statistically significant for all four tests: for Form A, blacks averaged 56.56 and whites 79.07; Form B, blacks averaged 57.25 and whites 75.51; Form C, blacks averaged 60.61 and whites 75.51; and Form D, blacks averaged 79.93 and whites 99.

For Form A of the examination, a relationship, statistically significant at the 95% confidence level, was found between test scores and four job dimensions, while one other job dimension related at the 90% confidence level. Ratings on only two job dimensions were found to correlate positively with scores on Form B of the test at the 95% confidence level. For Form C, ratings on two job dimensions bore a 95% confidence level relationship to test scores, and two others were marginally significant at the 90% level. Only one job dimension sig-

nificantly related to Form D test scores at the 95% confidence level, while two others were marginally significant at the 90% level.

None of the task statements from which job dimensions were derived was found by more than 25% of incumbents to be necessary at entry.

Dr. McDaniel concluded that the examinations at issue were criterion validated since scores on each bore a positive relationship to some aspect of job performance. Another of defendants' experts, Dr. William Owens, testified that the criterion validity study was "a better study than most" and agreed that it indicated a low significant positive correlation between job performance and test scores.

*(d) Plaintiffs' Criticisms of Criterion Validity Study.*

Dr. Baxter was of the view that supervisors should have been better instructed and given an opportunity to observe employees performing job dimension duties before rating them. Furthermore, he noted that there was no assurance that an employee's immediate supervisor, having most intimate knowledge of job performance, was responsible for rating the employee.

Baxter also criticized the "concurrent" nature of the criterion validity study; for example, since tests and ratings were administered at approximately the same time, it was likely that a person's experience on the job better enabled him to perform satisfactorily on the test. Baxter was of the opinion that the study was a very poor measure of eventual job performance since the difference in black and white test scores was 6.5 times larger than the difference in job performance as rated by supervisors. For example, Clerk/Typists with ratings of 6 scored from 60 to 110 on the Clerk/Typist Form B examination. Similarly, Eligibility Workers with performance ratings of 7 had test scores ranging from 50 to 110, thus showing that test score had little bearing on actual job performance.

Lefkowitz also took issue with the "concurrent" nature of the study, and also noted that the study did not take into account any element of bias, whether in the sample, ratings, or the examinations themselves. Concerning sample bias, for example, it was reasonable to assume that Social Workers taking four examinations would undergo a learning process during the test-taking and might, therefore, perform better on Form D than on Form A. As to rating bias, supervisors' ratings should have been measured against some objective index of performance, e.g., job tenure, cases disposed of successfully, etc. Furthermore, since raters were anonymous, the possibility of evaluating racial bias was precluded. Finally, the studies did not analyze the possibility of test bias, i.e., whether an examination was a valid predictor of job performance for whites but not blacks.

Lefkowitz concluded that although the examinations might have low positive validity, there was no evidence that the tests were useful in predicting successful job performance and, in light of the significant adverse impact on blacks, the tests should not be used. This expert summarized the following impracticable consequences had Eligibility Workers who took the examination as part of the validity study been rejected because of a failing grade:

1. Test shows "adverse impact"
 a. 75% Pass Rate for Blacks
 b. 99% Pass Rate for Whites
 c. Pass Rate for Blacks is 76% of White Pass Rate
2. Test is not very useful (practical)
 a. 31% Misclassifications [i.e., people passing test performed poorly on the job; people failing test did well on the job]
 b. No improvement in proportion of successful employees who would have been selected by the test (70%) over proportion successful without use of the test (68%)

3. Test would have considerable "social cost"
 a. Almost half (47%) of all applicants failing the test succeeded on the job
 b. Moreover, this pertains almost exclusively to Blacks (only 1 White failed)
4. Test is unfairly biased against blacks
 a. Pass Rate for Blacks is only 76% of the White Pass Rate, BUT
 b. The success rates on the job are virtually identical, 67% and 69% respectively.[12]

The court finds as a fact on disputed evidence that defendants failed to demonstrate that the written examinations employed by them either had a substantial relationship to the tasks of the job being tested for to have content validity or provided test scores for reliably measuring job performance.

*Selections from Certificates of Eligibles*

As a third selection step, persons possessing the minimum educational qualification and passing an examination are placed on a certificate of eligibles for employment consideration by county directors who interview the eligibles, recommending one or more for appointment by the Commissioner. Again, statistician Kolesar presented several analyses concerning this phase in the selection process to determine if it impacted on black applicants.

Kolesar first looked at mixed certificates of eligibles, i.e., those containing the names of at least one black and at least one white, from March 24, 1972, until October 31, 1974, during which time a total of 1,179 names appeared on certificates for positions of Eligibility Worker, Social Worker I, and Clerk/Typist I. The following table indicates the numbers of blacks and whites appearing on certificates of eligibles, as well as the actual number of black and white selections and the numbers one would expect from a racially neutral selection process. The table also shows the percentage of blacks and whites appearing on certificates and eventually selected.

12. Similar data for Social Worker and Clerk/Typist positions was not available.

SELECTIONS FROM MIXED CERTIFICATES
March 24, 1972 to October 31, 1974

| Position | # Names on Certif. | | Actual # Offers | | Expected # Offers | | % Selected | |
|---|---|---|---|---|---|---|---|---|
| | White | Black | White | Black | White | Black | White | Black |
| Clerk/Typist | 164 | 128 | 67 | 32 | (56) | (43) | 41 | 25 |
| Elig. Worker | 483 | 315 | 182 | 49 | (140) | (91) | 38 | 16 |
| Social Worker | 50 | 39 | 13 | 6 | (11) | (8) | 26 | 15 |
| Total | 697 | 482 | 262 | 87 | (206) | (143) | 37 | 18 |

Thus, the white selection rate was 208% of the black selection rate for all three positions combined; 164% for the Clerk/Typist I position; 242% for Eligibility Workers; and 169% for the Social Worker I job. Other than data on the Social Worker position, which contained a small sample size, all the above differences in white and black selection were statistically significant at the 99% confidence level.[13]

Kolesar also considered the rate of nonselection from all-white and all-black certificates issued between March 24, 1972, and October 31, 1974. For all three positions combined, selections were made in 78.4% of all-white certificates, but only 35.7% of all-black ones. This difference was statistically significant at the 99% confidence level.

For Eligibility Worker certificates, there were 18 all-black and 105 all-white certificates during this time period. Of these, 89 selections were made—6 black and 83 white. A racially neutral process would result in 13 black and 76 white selections. Selections were made in 79% of all-white certificates, but only 33.3% of all-black ones. This difference was statistically significant at the 99% confidence level, and the white selection rate was 237% of the black rate of employment.

There were 3 all-black and 23 all-white certificates for the Social Worker I position. Of these, 17 selections were made, all going to whites. One would expect 2 black and 15 white selections. Although selections were made in 73.9% of all-white certificates and 0% of all-black ones, the sample size was too small to carry out the statistical significance test.

For the Clerk/Typist I job, there were 21 all-black and 66 all-white certificates. Of these, 61 selections were made, 9 black and 52 white. One would expect 15 black and 46 white selections from a racially neutral system. While selections were made from 78.8% of all-white certificates, there were selections in only 42.9% of all-black certificates. This difference was statistically significant at the 99% confidence level, the white selection rate being 184% of the black rate.[14] These meaningful computations are not seriously challenged by defendants.

*Individual Claims of Discrimination*

In addition to statistical proof, plaintiffs presented testimony of eight persons who had unsuccessfully applied for Department positions.

Dorothy Walls applied for Social Worker and Eligibility Worker positions in June 1971 and passed both examinations. Possessing a B.A. degree in Sociology from the University of Mississippi, Walls was interviewed twice by Hermine Copeland, Director of Leflore County Welfare Department. Walls' name appeared on six certificates of eligibles for the position of Eligibility Worker between 1971 and 1973, yet she was not offered a position.

13. Similar results were obtained by considering certificates from January 1, 1972, until October 31, 1974.

14. Similar results were received from an analysis of all-white and all-black certificates from January 1, 1972, to October 31, 1974.

In the comments section of the first certificate on which her name appeared in December 1971, Copeland wrote: "She is available but after interviewing I do not feel she should be offered employment." No one was recommended for employment from this certificate. On March 2, 1972, another certificate issued from which Walls was omitted since at least five other persons were then ranked with higher scores. On July 25, 1972, Walls was listed as number five on a certificate of five persons, and Copeland wrote: "I do not think she is the person for this job and I do not believe I could control political activity." A white female whose name was at the top of the register was recommended for employment. On the next certificate whereon Walls' name appeared, Copeland noted: "Walls is available for employment. She is involved in local community activities that might cause difficulties if employed by the welfare department." No one from this certificate was recommended for employment; rather, Copeland returned it and requested another since three of seven individuals on it were not available for employment. A new certificate was issued on October 16, 1972, whereon Walls was listed number four of seven names, four of whom were black. No one from this certificate was recommended for employment; as to Walls, Copeland stated: "Political activities may result in conflict of interest." The same notation was made on a November 6, 1972, certificate on which Walls' name appeared and from which two individuals, one white and one black, were offered employment. Walls appeared third on a list of six names on a November 20, 1972, certificate, Copeland stating that she "appears qualified but community activities may cause conflict of interest." A black female appearing sixth on the list was appointed for that position. Rosalie Witty became county director in

early 1973. On January 19, 1973, Walls' name was again listed on a certificate, this time third out of five names, but Witty recommended a white female whose name appeared fourth and who would not be available for employment until May 1973. As to Walls, Witty stated merely that she "would not like to consider at this time." In March and November 1973, Walls failed to rank sufficiently high to be included on two certificates.

The evidence indicated, and we find as a fact, that Copeland's notations regarding Walls' "political activity" related to the fact that her husband was then employed with North Mississippi Rural Legal Services in Leflore County and had a civil rights suit pending against the county. Copeland never discussed this with Walls, however, although she did read her a Hatch Act statement limiting the political activities of the state agency's employees.[15]

Walls was hired by the Department on an emergency appointment basis as Eligibility Worker in 1975 and left that position three months later because of her pregnancy. She was rehired to a permanent Eligibility Worker position in July 1976, but resigned in March 1978 for unspecified reasons.

Deborah Jones Gambrell, a named plaintiff, at the time of trial was studying for the Mississippi State Bar examination. Her husband, Andrew Marlowe Gambrell, like Mr. Walls, was employed by North Mississippi Rural Legal Services. Gambrell first applied for employment with the Department in September 1971, at which time she was completing college coursework in political science. Gambrell, who had previously been employed by the Stone County Head Start program, passed the Eligibility Worker examination. She was also interested in employment in the Leflore County office and appeared on all six of the certificates of

15. The Hatch Act prohibits an officer or employee of federally funded state agencies from:

(1) us[ing] his official authority or influence for the purpose of interfering with or affecting the result of an election or a nomination for office;

(2) directly or indirectly coerc[ing] or attempt[ing] to coerce, command, or advise a State or local officer to pay, lend, or contribute anything of value to a party, committee, organization, agency, or person for political purposes; or

(3) be[ing] a candidate for elective office. 5 U.S.C. § 1502(a).

eligibles on which Walls' name was listed, in addition to five others, for a total of eleven certificates, from December 1971 to September 1973. Gambrell interviewed with Copeland on four occasions.

Gambrell's name first appeared fourth on a certificate of five individuals dated December 10, 1971; Copeland returned this certificate stating, "I do not believe anyone on it will be available and acceptable." As to Gambrell, Copeland noted that she "is not a native of Leflore County and I do not think she will be an asset to the staff." A new certificate was issued on December 30, 1971, on which Gambrell's name appeared second of five; again no one was recommended for employment, and Copeland wrote that "[Gambrell] is available but after interviewing I do not feel that she should be offered employment at this time."

Gambrell appeared for her third interview in March 1972. At that time she was employed by the Greenwood Community Project, a federally funded program designed to facilitate desegregation in Greenwood's public schools. Since the Community Project was operating under a one-year grant, Gambrell told Copeland that she still wanted a position with the welfare department. Copeland expressed the view that the Community Project was a worthy project and that Gambrell's experience there would be an asset to her employment with the Department. Copeland stated, however, that there were no openings at that time. Notwithstanding this representation, from a March 2, 1972, certificate, on which Gambrell's name was listed fifth of five, an individual was in fact appointed to a position, and Copeland wrote that "Gambrell is involved in local politics and I do not think she can represent the agency."

Gambrell again appeared for an interview in July 1972, when she and Walls went together to the county office. Copeland read them the Hatch Act statement, but did not explain the purpose of informing them of that rule. Copeland again stated that a position was not then available. Gambrell's name was listed fourth on a certificate of five individuals dated July 25, 1972, and a white female was recommended for employment, Copeland writing "I do not think [Gambrell] is suitable for employment because of community activities." Similar notations were made on certificates of eligibles dated October 4 and October 16, 1972, whereon Gambrell was listed second of seven names. No one from these registers was recommended for employment, and the latter certificate was returned because three of the seven individuals were not available for employment.

Between November 1972 and January 1973, Gambrell's name appeared on three certificates and was ranked second of seven, first of six, and first of five, respectively. On the first certificate, a white female was appointed over her because of "community activities that might cause difficulties if she is employed by the welfare department." A similar notation was made on a November 20 certificate, and the sixth name on that list was appointed for employment. On a January 19, 1973, certificate, Witty stated that she "would not like to consider [Gambrell] at this time" and recommended for employment a white female who would not be available for employment until May 7.

Gambrell's name appeared on certificates dated May 30 and September 12, 1973, but at that time she had moved to Hattiesburg and was no longer interested in working with the Leflore County office. In mid-1975, Gambrell was offered and accepted a position with the Forrest County welfare office, where she stayed for only four or five days because of her pregnancy and also because she did not have much to do, had no desk, and was given no training.

The three named plaintiffs other than Walls and Gambrell, i.e., Marlene Johnson, Julia Collier, and Emily Butler O'Bryant, did not testify at the trial of these actions. As to Collier, however, the deposition of the Leflore County director, received in evidence, indicates that she applied for a Clerk/Typist position at the Leflore County office and was interviewed by Witty on three occasions. Collier's name appeared on five certificates of eligibles from June 1973

until May 1974, yet was not offered a position. Although she was working in a department store at the time of her interviews, Collier had prior experience as a legal secretary and also as a file clerk.[16] Collier's name was listed third on a June 28, 1973, certificate of four names, and Witty noted that she was "acceptable" yet recommended for employment a white female. Collier was the only person available on certificates dated February 1 and March 5, 1974, but Witty felt that her "work experience seems inadequate" and requested other registers. Three names, including Collier's, appeared on a May 14 certificate; the two whites on that certificate were recommended because Collier's "work experience seems inadequate." Finally, Collier was the only person included on a May 30, 1974, certificate, but Witty did not recommend because of inadequate work experience. Witty explained that she was of the view that if Collier had performed adequately in her secretarial and filing jobs, she would have held a better position than working at a department store.

Six members of the class, however, appeared and gave testimony. David Washington applied for the position of Eligibility Worker in the East Bolivar County office in October 1973. Possessing a B.S. degree in social studies and lacking only six hours for a graduate degree in counseling, Washington preferred a Social Worker position but was told that none was available. Washington had received numerous awards in high school and college, including outstanding student, salutatorian award, and who's who among outstanding students. He passed the Eligibility Worker examination and was notified to appear for interview in December 1973. As stated in his letter accompanying the employment application, Washington was serving as vice-mayor for the Town of Pace but he was willing to leave that nonsalaried position. During an interview with Evelyn Wilkinson, East Bolivar County Director, he reiterated his desire to obtain permanent employment, as well as his intention to resign as vice-mayor should a position be offered. Washington was listed on six certificates of eligibles during a six-month period.

Washington's name appeared fourth on a certificate of five dated November 21, 1973. The first name on the list, i.e., a white female with three years college and no work experience, was appointed to the position. Although no comments regarding Washington were written on that certificate, Wilkinson noted on a January 10, 1974, certificate on which Washington's name was listed fourth of six, as follows:

Mr. David Washington, age 25, lacks only six semester hours in obtaining a Masters Degree in Guidance from Delta State. He is single and mobile; he is quite anxious to obtain employment with our agency.

Mr. Washington now holds an elective office (alderman in the town of Pace) and serves this community as vice-mayor. In this position he has become quite active in political circles.

Mr. Washington and I reviewed Merit System regulations [prohibiting political activities]. He stated that he would willingly sacrifice his love for politics and resign his office if given an appointment to our staff.

Mr. Washington undoubtedly has many attributes and might become a valuable DPW employee. However I believe that it would not be advisable for him to work in his home county (Bolivar) as it would be extremely difficult for him to disassociate himself completely from the political scene.

A white female listed second on the certificate was appointed to the position; this individual had a degree in accounting and had prior work experience in clerical areas only.

Washington's name was ranked second on a March 6, 1974, certificate of eligibles, from which the top ranked individual, a

---

**16.** In fact, Collier's prior experience of more than one year qualified her for a Clerk/Typist II position.

black female, was offered but declined employment. Wilkinson's memorandum referenced her comments in the previous certificate. Washington's name again appeared on a certificate of April 15, 1974, wherein he was ranked second of six. No one from this certificate was recommended for employment, and Wilkinson noted that "Washington's political activity would probably present a problem." On an April 18, 1974, certificate of eligibles, Washington and another black male were the only two individuals then available for employment. No one was recommended for employment, Wilkinson writing that "[Washington] has had no work experience other than vice-mayor in town of Pace as has been in college. Is working on M.A. degree at present time. Most pleasant and polite." Washington was the only person available for employment on a May 16, 1974, certificate, and yet was not offered the position. Comments stated that "applicant holds political office. Even if he resigns this office it might be difficult for him to disassociate himself from politics."

Unable to find a job, Washington, in June 1974, received and accepted a one-year fellowship with the Leadership Development Program of the Ford Foundation. At the time of trial, he was serving as vice-mayor of Pace, Director of Delta Demonstration, Child Development Center, and Equal Employment Opportunity Officer for Bolivar County Community Action Agency. Washington is no longer interested in employment with MSDPW.

Jean Hughes applied for positions of Social Worker and Eligibility Worker at the Jones County office in December 1971. She had just received her B.A. degree in sociology from Jackson State University and while a student had worked with the Family Counseling Center. Hughes passed examinations for both positions and was notified that the Department would contact her for an interview when a position became available. Hughes later learned that a white male obtained the position for which she applied. After filing a charge of discrimination with EEOC in the summer of 1972, she was contacted by the Jones County Director, G. H. McBride, who said that she would be interviewed for a position. Hughes claimed that board member E. U. Parker, in a telephone conversation, stated that she would be offered a job if she dropped the EEOC charge; Parker unequivocally denied making such statement. The court resolves this dispute by accepting Parker's version. Hughes was interviewed twice in 1973 by McBride and appeared on certificates of eligibles dated October 15, 1973, November 2, 1973, June 17, 1974, and January 15, 1975. She was never recommended for appointment, the only reason stated being "because of prior interviews." Someone else from each certificate was recommended for employment, and in several instances the person recommended was ranked lower than Hughes. In 1975, Hughes received notice that her name was being removed from the register and that she would have to retake the examination if she was still interested in employment with the Department. After voicing her objections to this proposal, Hughes was offered and accepted a position of outreach worker, which she resigned six months later to take a better job.

Mary Ann Marshall first applied for a MSDPW position in 1969. Marshall held a B.S. degree in business education, passed the Social Worker test which automatically made her available for Social Worker and Eligibility Worker positions, and was interviewed by Maxine Williford, Director of Pike County Welfare Department. Although Marshall was then teaching school in Columbus, Mississippi, she stated that she told Williford that she would gladly resign her teaching position to become employed at the Pike County office. Nonetheless, Williford indicated on a certificate of eligibles dated February 24, 1972, that Marshall was teaching school and was not available. In 1973, Marshall was notified that if she was still interested in MSDPW employment, she would have to retake the test, which she did, receiving a passing score. Despite contrary testimony, we find as a fact that during an interview with Acting Director F. D. Cliett, Marshall stated that

while she was presently employed at a manufacturing company, she wished to resign from that job and work with the welfare department; Cliett, however, noted on a certificate of eligibles dated August 29, 1973, that she would not be available until October 1, because of her present employment. A white female with a degree in psychology and sociology and prior banking experience was hired for this vacancy. Marshall and a black male were the only individuals on an October 1, 1973 certificate available for a position, and the position remained unfilled. Comments by Williford regarding Marshall were that she "seems a little immature for the type work for which she was interviewed." Marshall ranked first on a November 1, 1973, certificate, yet the only white person available, who was ranked fourth, was offered the position. Williford made reference to her previous remarks regarding Marshall.

One day in early February 1974, Marshall received a notice that she was to appear for another interview that same day at 1:30 p. m. Since it would be impossible for her to arrive on time, she called Mrs. Williford's office and was told she could come in around 3. When Marshall arrived at 3, Williford said that she had already sent the certificate back to Jackson. Marshall testified that Williford did not mention her failure to appear on time, and described their conversation as follows:

[W]hen I got there Mrs. Williford told me, she said she was sorry but she had to send the roster back to Jackson because when they tell her she . . . has to send it back. She says she is only following orders just like everybody else. . . .

And I said, "Mrs. Williford, why do you think I haven't been hired so far"? I said, "I want your honest opinion". She said, "Mary, I just don't know". Because, she said, "All I do is just interview and people from Jackson do the [hiring]". And she said, "Well, why do you feel"? I said, "I feel like it is because I am black", one of the main reasons. And I said, "You know, I was thinking about it because when I went to interview with Mr. Cliett he sat there and turned in his chair

all day and he told me the main reason I hadn't been hired in '69 was because I was black".

. . . . .

Anyway, Mrs. Williford told me that she didn't think that was the reason, that it was probably was my low test score, and that if I felt that way I should check in Jackson with those people. . . . And I said, well, I was under the impression that the county people did the hiring. And she said, no, that she didn't have anything to do with it.

The certificate apparently was not sent back to Jackson as indicated, for Williford, in a letter dated February 8, 1974, noted that only one person on that certificate other than Marshall had responded and requested issuance of another register. In that letter, Williford stated:

*Mrs. Mary Marshall*—Black, twenty-seven year old woman graduate of Jackson State, Mrs. Marshall seemed somewhat hostile at first because she has been interviewed so many times and is not hired. She had been given an appointment for 1:30 p. m. and did not come in until 3:00 p. m. She gave no reason for not notifying me that she would be late for her appointment.

. . . . .

Although she has a pleasing personality once her "feathers are soothed" I am doubtful (very) that she would make a good worker. She kept saying that she was sure that the reason she did not get the job was that she was Black. I assured her that it was not. I also told her that I had waited until after 2 p. m. before calling the State Office and requesting another Register and that being late for an appointment was very bad.

Marshall appeared on another certificate of eligibles dated February 11, 1974, from which a white female with a lower test score was appointed; Williford referenced her previous comments regarding Mrs. Marshall.

Marie Hopson Lee applied for a position with the Coahoma County welfare office in

June 1972, at which time she had completed two years of junior college education and received Associate of Arts degree in social science. As well as having an A minus grade average at junior college, Lee had two years experience working as a social worker aide in adult education. Although she was teaching school at the time, she was not working under a contract and was available for employment with the Department. Lee's name appeared fourth on a certificate of six dated October 3, 1972, from which two positions were to be filled. Only three individuals on the certificate were then available for work, two blacks, including Lee, and one white. The white person was hired to fill one vacancy, and the other remained unfilled. Kenneth T. Dixon, Director of Coahoma County Welfare Department, stated as to Lee: "Presently teaching school but will quit teaching to take this position. I hesitate to recommend at this time as she is presenting teaching school. If we have a vacancy when school is out I will be glad to reconsider her for appointment." Dixon requested another certificate for use in filling the other vacant position. Lee was ranked second on a certificate of six dated November 1, 1972, from which two positions were to be filled. A white female and a black male were appointed to these vacancies, and Dixon referred to his previous comments relative to Lee. Lee was ranked first on a December 6, 1972, certificate of five, yet a white female ranked third was appointed; Dixon again referred to his earlier comments of Lee. Her name again appeared on a certificate dated March 15, 1973, but a black male was selected. No additional comments on Lee were made.

The school year ended in the latter part of May 1973, and Lee was ranked at the top of two separate certificates dated May 14, 1973. Two positions were to be filled from the first certificate, and Lee and two other blacks were the only persons then available for employment. Neither position was filled. Dixon, who previously commented that he would consider Lee when the school year was over, stated that "[she] has been passed over five times previously and we request her name be removed from the register." The second May 14 certificate was for one temporary position. A white female was hired, and Dixon again requested that Lee's name be removed from the register. Lee was never offered a position with MSDPW.

Fannie Marshall applied for an Eligibility Worker position with the Issaquena County welfare office in June 1973. She had learned that there was an opening and went to talk with Sidney Fernandez, Issaquena County director, who told her that he had pretrained someone for the position, who she later found out was white, but that they had an opening for clerk/typist. Marshall, who had a college degree in Business Administration, worked in that position temporarily, during which time a Social Worker position became available. The Clerk/Typist and Social Worker exams were to be given on the same day, and although Fernandez told her he thought she would be better off taking the Clerk/Typist test, she decided to take the Social Worker exam instead. Upon receiving notification that she had passed the test, Marshall asked Fernandez about the Social Worker opening, and gave the following testimony regarding that conversation:

I went to him and explained that I had passed the Social Worker's exam. And he said that he had someone else in mind for the job, although I was working there. And he said that he didn't feel that I was qualified for the job because I didn't talk enough. So, I explained to him that I did my work, and I was wondering why he wouldn't consider me for the job. And the only thing he would say is, he just felt that I couldn't do it because the only thing I had done was stayed at home and went to college and came back. And then I hadn't been out of the state, you know, around enough to be a Social Worker.

The person Mr. Fernandez "had in mind" was a white female. In early 1974, another vacancy occurred, and Fernandez again stated he had someone else in mind and felt Marshall could not perform the job. Marshall then turned in her resignation.

Later, in June 1974, she learned that an Eligibility Worker position was available. Marshall thereupon reapplied and called Margaret Jackson at the state personnel office. Although she was then living in St. Louis, Marshall explained that she was still interested in working in the state and was placed on the Eligibility Worker register. She talked with Fernandez several times about the position, but he finally hired someone else. Yet another Eligibility Worker position became available in Issaquena County, and Fernandez again stated he had someone else in mind. When this person turned down the position, Fernandez told Marshall that a CETA position was available. She was hired for the CETA position in June 1977, and in August 1977 became a provisional Eligibility Worker, in which position she remained at the time of trial.

Beverly Harris Lewis applied for an Eligibility Worker position in the Washington County welfare office in the summer of 1972. At the time, she was working with STAR, Incorporated, a federally-funded program which helped people obtain educational skills and food stamps, but was interested in more stable employment since the program was not permanent. Lewis appeared first on a certificate of eligibles dated October 20, 1972, and interviewed with county director Lena Wood. A white female was offered and declined the position and another white female was appointed. Wood stated: "We are passing over Mrs. Beverly Harris Lewis for the first time. We believe that we have better applicants at the present time. We have had contact with Mrs. Lewis as she is presently employed at STAR and has been working with this agency since September 1971." These comments were referenced when Lewis was passed over on a December 26, 1972, certificate and two white females were recommended for appointment. Lewis learned that other persons had been employed and hired an attorney to investigate the matter. The attorney wrote to Wood, who later called Lewis in for another interview for a position offered from a February 15, 1973, certificate, on which Lewis' name

appeared second. A black female, listed last on the certificate, was recommended for employment, Wood stating:

We have interviewed Mrs. Beverly Lewis Harris [sic] for the last three registers. Mrs. Harris [sic] has been employed at STAR since August 1971. In this capacity she was in and out of the food stamp office with people purchasing food stamps and applying for food stamp eligibility. She gave the food stamp staff some problems at times in her manner and attitude toward the Food Stamp Program.

Wood had never discussed any such problem with Lewis, who could recall only one incident during which she and another STAR employee had a verbal altercation. Lewis' name appeared second on a certificate dated March 26, 1973, from which two positions were to be filled. Two white individuals were recommended for employment, and Wood noted: "We are passing over Mrs. Beverly Lewis Harris [sic] for the third time and request that her name be removed from the register."

Subsequently, Lewis read that Wood had resigned, and she decided to try again to get an appointment. She learned from the new director that her name had been removed from the register and was therefore required to retake the test, which she did, receiving a passing score. About four months later, she was hired to an Eligibility Worker position, and was later promoted to Social Worker, where she remained at the time of trial and for which she has received high performance ratings.

The foregoing recitation of individual claims is sufficient to demonstrate lack of objectivity on the part of county directors in the final stage of the selection process and to raise serious question as to whether legitimate, nondiscriminatory reasons support the recommendations made.

## CONCLUSIONS OF LAW

Though consolidated for trial, these cases present somewhat different legal questions that bear initially on liability and ultimate-

ly on relief. In the class discrimination suit of the named plaintiffs, their standing to challenge the educational and examination requirements is at issue, as well as the sufficiency of the evidence to vindicate claims of racial discrimination based on disparate impact and disparate treatment under appropriate legal standards. In the pattern and practice suit of the United States, the court must consider the sufficiency of evidence as well as the significance of the federal government, which though plaintiff in its case is also defendant in the private plaintiffs' action, having participated in the development and maintenance of employment policies and practices now challenged as racially discriminatory. The several issues thus presented are disposed of in the following analysis.

*Education Requirements*

In challenging defendants' educational requirements, private plaintiffs and the government [17] utilize the "disparate impact" theory of discrimination, which is "invoked to attack facially neutral policies which, although applied evenly, impact more heavily on a protected group." *Little v. Master-Bilt Products, Inc.*, 506 F.Supp. 319, 332 (N.D.Miss.1980). Proof of intentional discrimination is not necessary under the disparate impact model; rather, "[o]nce a significant disparate impact is found, the defendant must show that the questioned policy bears 'a manifest relation to the employment in question,' and that this business necessity may not be met by other policies which would impact less severely on the protected group." *Id.*, quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158, 165 (1971).

(a) *Private Plaintiffs' Challenge.*

 Although the Fifth Circuit continues to endorse "across-the-board" class ac-

tions in employment discrimination actions, it has also specifically held that named plaintiffs satisfying an employer's minimum educational requirements "[a]t the time crucial to the issue of standing, when the complaint was filed" lack standing to bring a class action challenging those requirements. *Payne v. Travenol Laboratories, Inc.*, 565 F.2d 895, 898 (5 Cir.)., *cert. denied*, 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1978); *see Phillips v. Joint Legislative Committee*, 637 F.2d 1014, 1026 n.20 (5 Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 2035, 72 L.Ed.2d 483 (1982). Furthermore, it is irrelevant that some class members may have the requisite standing. *Cf. Sosna v. Iowa*, 419 U.S. 393, 402, 95 S.Ct. 553, 558, 42 L.Ed.2d 532, 542 (1975). And the legal requirement of standing may not be substituted by an adversarial presentation of sharply conflicting interests. *Valley Forge College v. Americans United for Separation of Church and State*, —— U.S. ——, 102 S.Ct. 752, 70 L.Ed.2d 700, 718 (1982).

In the case sub judice, each named plaintiff, at the time the complaint was filed,[18] satisfied the minimum educational qualification for the position(s) for which she applied. Accordingly, private plaintiffs lack standing to challenge these requirements and are not appropriate representatives of a class of persons aggrieved by the education requirement.

(b) *Government's Challenge.*

 The government, of course, may challenge the educational qualifications under 42 U.S.C. § 2000e–6. To be successful, however, the government must first establish that the practice has a disproportionate impact upon members of the black race,

---

**17.** Although 42 U.S.C. § 2000e–6 requires the government to prove "that the pattern or practice [of discrimination] is of such a nature and is intended to deny the full exercise of the rights herein described," "[t]he requisite intent may be inferred from the fact that the defendants persisted in the conduct after its racial implications had become known to them." *Local 189 v. United States*, 416 F.2d 980, 997 (5

Cir. 1969), *cert. denied*, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 108 (1970). Thus, the burden of proof is essentially the same in the private plaintiffs' and government's actions.

**18.** It is irrelevant that prior to the filing of the complaint, Gambrell did not have a college degree and thus qualified only for an Eligibility Worker position. *Payne, supra.*

which, it contends, was satisfied by (1) the low percentage of blacks, as compared to whites, possessing a high school degree (52.6% white and 14.9% black) and college degree (10% white and 3.7% black); and (2) the low percentage of blacks in the Department's workforce. Mere census data indicating that fewer blacks than whites possess a challenged educational requirement is not sufficient to indicate the disparate impact of that requirement; rather, plaintiffs must "demonstrate that the racially disparate impact on defendant employer's workforce which was *otherwise* established, was *due to* the challenged job requirement, and not to some other practice of the employer or other cause." *Townsend v. Nassau County Medical Center*, 558 F.2d 117, 120 n.6 (2 Cir. 1977) (emphasis original), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 759 (1978). To allow disparate impact to be shown simply by disparities between blacks and whites meeting an educational barrier, without more, would open challenges to such requirements of all employers, without regard to whether a particular employer hired substantial numbers of blacks. We therefore hold that it is altogether proper to require that a plaintiff must establish that a disparity of blacks in the workforce was itself directly caused by the challenged educational barrier. The government did not offer any proof to show that "independent of other factors the [educational requirement] . . . caused the racial imbalance in [the Department's] work force." *Pouncy v. Prudential Ins. Co.*, 668 F.2d 795, 801 (5 Cir. 1982). Indeed, the evidence shows that the low number of blacks in the MSDPW employ was due not to educational requirements but to the use of examinations or other reasons. The fact that for five months during 1975 46.7% of applicants taking Eligibility Worker tests were black, 29.4% of those tested for Clerk/Typist were black, and 47.2% of individuals taking Social Worker exams were black, convincingly demonstrates that educational requirements were not the cause of the lack of blacks in the MSDPW workforce, since one could not take the appropriate examination without satisfying the edu-

cational prerequisites. Considering the 29.6% of blacks in the state's total labor force, it is plainly evident that blacks having educational qualifications sought MSDPW positions in substantial numbers. Our conclusion that the sparsity of blacks at the Department was not the result of the educational requirement is reinforced by post-1975 workforce data indicating that large increases in educationally-eligible blacks were employed once *examinations* for the contested classes were suspended.

■ The government argues, however, that but for the minimum education qualifications even more blacks would be eligible for Department employment, thus resulting in an even larger percentage black workforce than now exists. We reject this contention since neither Title VII nor other federal law requires an employer to choose selection devices in a manner which would maximize black participation, but requires only that the employer not utilize standards which discriminate against members of the minority race. The court therefore holds that the educational requirement has not been shown to produce a disparate impact upon minority applicants. As our later analysis will show, the reduced number of blacks selected by MSDPW is the result of other practices having no relationship whatever to educational standards.

### Testing Requirements

Like the claims regarding educational qualifications, private plaintiffs and the government invoke the "disparate impact" theory of proof in their attempt to establish the unlawfulness of defendants' testing program. Defendants contend (1) that private plaintiffs lack standing to make this challenge; (2) that the tests are part of a "bona fide merit system" insulated by § 703(h) (42 U.S.C. § 2000e–2(h)) in the absence of a showing that they were used with the intent to discriminate; and (3) that the examinations are job-related and required by business necessity.

### (a) *Private Plaintiffs' Standing.*

Defendants maintain that since no private plaintiff failed any examination after the date Title VII was made applicable to states, i.e., March 24, 1972, they may not challenge the use of examinations under Title VII, but must proceed only under § 1981, § 1983, and the fourteenth amendment. The examinations were used, however, not only as a device to screen out applicants, but also for ranking purposes, and the latter use of the tests resulted in adverse consequences, after March 24, 1972, to named plaintiffs who did receive a passing score. For example, although plaintiffs Walls and Gambrell appeared on a certificate of eligibles in August 1972, a white person was selected because she was "at the top of the register" by virtue of having the highest test score. In addition, Walls' name was omitted from two certificates of eligibles in 1973 because at least five other persons on the register had scored higher on the examination. Accordingly, the court concludes that private plaintiffs have standing under Title VII, as well as § 1981, § 1983, and the Constitution, to challenge defendants' use of examinations.

### (b) *Bona Fide Merit System Defense.*

Defendants invoke § 703(h) for the proposition that plaintiffs must establish that the tests were used with the intent to discriminate against blacks since the testing system was part of a merit system of employment. That section provides:

> Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system ... provided that such differences are not the result of an intention to discriminate because of race ....

42 U.S.C. § 2000e–2(h). With regard to the "merit system" exemption, we agree with the Second Circuit Court of Appeals and hold that, even assuming the term encompasses hiring practices, "it is clear that a hiring system that ranks applicants according to their performance on discriminatory examinations cannot claim the status of a 'bona fide merit system' within the meaning of the statute." *Guardians Association v. Civil Service Commission,* 633 F.2d 232, 252 (2 Cir. 1980), *cert. granted,* —— U.S. ——, 102 S.Ct. 997, 71 L.Ed.2d 291 (1982). Whether the tests at issue were part of a "bona fide merit system" begs the question, for unlike the seniority systems upheld in *American Tobacco Co. v. Patterson,* —— U.S. ——, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982), and *Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), which indisputably measured seniority, an invalid test cannot measure "merit."

> Section 703(h) makes sense only if the term "bona fide merit system" is understood to refer to merit in areas related to the necessities of the business, not "merit" in the abstract. Nothing in *Teamsters* implies that by labelling a non-job-related system of employee selection a "merit" system, an employer can avoid the command of Title VII that it henceforth select its workforce in a nondiscriminatory fashion.

*Guardians, supra,* at 253. *See Association Against Discrimination v. City of Bridgeport,* 647 F.2d 256, 273 (2 Cir. 1981). We therefore conclude that the merit system exemption does not insulate examinations unless they are found to be job related.

### (c) *Job Relatedness and Test Validity.*

Defendants do not seriously argue that the contested examinations did not have a disparate impact on blacks, and we here find conclusively that plaintiffs established a marked disparate impact of testing on blacks by Dr. Kolesar's uncontradicted testimony regarding significant differences in test scores of blacks and whites as well as a significantly higher number of blacks failing the tests than whites. Indeed, the computations of the state's expert, Dr. McDaniel, reinforce this finding that the examinations had a disparate impact on blacks. Since the 1971 decision of *Griggs, supra,* it has been established that a test having a disparate impact on minorities violates Title

VII unless it has "a manifest relationship to the employment in question." As stated in EEOC regulations, entitled to great deference by this court:

The use of any test which adversely affects hiring, promotion, transfer or any other employment or membership opportunity of classes protected by title VII constitutes discrimination unless: (a) The test has been validated and evidences a high decree of utility . . ., and (b) the person giving or acting upon the results of the particular test can demonstrate that alternative suitable hiring, transfer or promotion procedures are unavailable for his use.

29 CFR § 1607.3 (1978). We are thus required to determine whether the examinations in question have been shown to be sufficiently job-related, since "any tests used must measure the person for the job and not the person in the abstract." *Griggs, supra*, 401 U.S. at 436, 91 S.Ct. at 856, 28 L.Ed.2d at 167.

We begin by noting that although the examinations were prepared by the federal government, EEOC regulations state that "[u]nder no circumstances will the general reputation of a test, its author or its publisher . . . be accepted in lieu of evidence of validity." 29 CFR § 1607.8 (1978). Furthermore, "[a]lthough professional supervision of testing activities may help greatly to insure technically sound and nondiscriminatory test usage, such involvement alone shall not be regarded as constituting satisfactory evidence of test validity." *Id.* As the Fifth Circuit has noted, "a test which excludes proportionately more blacks than whites from employment . . . may be prohibited under the Act . . . in spite of professional origins of the test." *United States v. Georgia Power Co.*, 474 F.2d 906, 911 (5 Cir. 1973). As a practical matter, however, "[i]f an examination has been badly prepared, the chance that it will turn out to be job-related is small. *Per contra*, careful preparation gives ground for an inference, rebuttable to be sure, that success has been achieved." *Vulcan Society v. Civil Service Commission*, 490 F.2d 387, 396 (2 Cir. 1973). In the case sub judice, the examinations

were developed by the United States Civil Service Commission with input from persons with experience in both testing and the job areas for which the tests were to be used. On the other hand, the Commission filled the requests for examinations on the basis of, inter alia, class specifications of the position, provided by the state, and these specifications more often then not provided only a cursory description of job duties.

A consideration of the EEOC guidelines, as well as the professional standards regarding testing as stated by the various experts testifying in these actions, compels us to conclude that neither content nor criterion validity has been sufficiently established. A content valid examination must not only test required skills and aptitudes, it must test them in proportion to their relative importance on the job. *Guardian, supra*, at 243–44.

The methodology employed by defendants' experts in the content validity study does not meet this standard. Specifically, the broadness of task and KSA statements rendered difficult, if not impossible, a reliable determination of their relevance to the particular position. Many KSAs justifying test subparts were in reality "personal characteristics" such as "self-esteem" and "professionalism" which, in our view, may not be tested in an examination such as those in issue. Moreover, the great majority of tasks and KSAs purportedly tested for were not found by incumbents to be necessary at entry. Perhaps most important is that examination questions were not specifically analyzed with the view of determining whether each item related to the job in question; hence, questions asking which country was most affected by the Industrial Revolution and how many Senators are elected from each state were said to have content validity, although it cannot seriously be argued that a Social Worker needs this knowledge in order to perform her job.

Similar problems exist with the criterion validity study, which must correlate test scores with job performance. It is notewor-

thy that the job criteria rated by supervisors were derived from task statements which incumbents overwhelmingly found were not necessary at entry. Supervisor ratings were not examined for evidence of bias, nor were differential validity studies prepared for all contested positions. Even ignoring these problems, however, we must conclude that there is insufficient evidence that the tests were useful in predicting job performance, and although some relationship between incumbents' test scores and performance ratings was found, the court "cannot assume that because there is a relationship between test performance and current job performance for persons *with* job experience that a similar relationship obtains for applicants *without* job experience." *League of United Latin American Citizens v. City of Santa Ana*, 410 F.Supp. 873, 874, 904 (C.D.Cal.1973) (emphasis original). Moreover, there is inadequate evidence to show that the tests were valid for purposes of ranking, as opposed to screening out applicants, since there is nothing to indicate "that those with a higher test score do better on the job than those with a lower test score." *Ensley Branch of NAACP v. Seibels*, 616 F.2d 812, 822 (5 Cir.), *cert. denied, sub nom. Personnel Board v. United States*, 449 U.S. 1061, 101 S.Ct. 783, 66 L.Ed.2d 603 (1980).

We therefore find as a matter of fact and conclude as a matter of law that the contested examinations were not sufficiently job-related to allow their use as selection or ranking devices, in light of their significant disparate impacts on minorities, and hence violate Title VII.

■ As to the testing challenges based on § 1981, § 1983, and the fourteenth amendment, we conclude that plaintiffs failed to establish that the racially neutral testing devices may be "traced to a racially discriminatory purpose." *Washington v. Davis*, 426 U.S. 229, 240, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597, 608 (1976); *see Williams v. DeKalb County*, 582 F.2d 2 (5 Cir. 1978) (applying *Washington* to actions under 42 U.S.C. § 1981). We find from the evidence that written tests were used by defendants not with intent to discriminate against minorities, but only as a selection device for new employees, first mandated and later suggested and authorized by agencies of the United States government. Absent federal origin, there is no reason to believe the state would have resorted to an unvalidated testing procedure, and purposeful discrimination has not been shown. Accordingly, we hold that the claims of private plaintiffs and the government regarding testing based upon § 1981, § 1983, and the United States Constitution fail for lack of proof, and are therefore rejected.

(d) *Title VII Class Membership.*

■■ Since the opening date for membership in a class for a Title VII claim is set by reference to the earliest charge filed by a named plaintiff, *Payne v. Travenol Laboratories, Inc.*, 673 F.2d 798, 813 (1982), we note that Dorothy Walls filed the first EEOC charge on August 9, 1972. She can represent a class that includes all black applicants injured by the examination and scoring requirement who could have filed a timely charge with the EEOC when she did. Although the charge filing period in August 1972 was 180 days after the alleged act of discrimination, it necessarily follows that since public employers were first brought under Title VII by the Equal Employment Opportunity Act of 1972, Pub.L. 92–261, effective March 24, 1972, the opening date for class membership may not extend past the effective date of coverage for the plaintiff class. *Cf. Carey v. Greyhound Bus Co., Inc.*, 500 F.2d 1372, 1379 (5 Cir. 1974). Moreover, the Title VII class membership cannot extend forward beyond December 1, 1976, since written examinations were discontinued in November of that year.

(e) *Liability for Relief.*

■ Although the tests are invalid under Title VII, the clear fact is that they were received from the United States government, which, in addition to private plaintiffs, now condemns their use. Test developers are also required to follow standards established by the American Psycho-

logical Association, yet it appears that the government failed to comply with these considerations and, at least, was negligent in providing the examinations under challenge without adequate disclosure of potential risks involved. There is no unequivocal evidence that the Civil Service Commission or any other federal agency involved ever told state officials that the examinations were not properly validated and should not be used. Indeed, the Commission in 1973 failed to complete a validity study begun by the state. The most the Commission did to mitigate its error was to recommend use of training and experience in addition to the examinations now questioned. Even the government officials acknowledge that the United States was the only source of free examination materials and that they recommended use of no other tests. Moreover, although the federal standards did not actually require use of written exams, they did require applicants to be ranked, and the court is at a loss to understand how this ranking could be objectively accomplished without the use of written tests. Of course, "reliance upon Government approval of or participation in the formulation of the employment practice is not generally a defense in a Title VII suit." *Stevenson v. International Paper Co.*, 516 F.2d 103, 111 (5 Cir. 1975). Although we find that the United States was as much at fault in encouraging the use of its tests as were the state officials in accepting the federal examinations at face value, yet the doctrine of sovereign immunity precludes any judgment for monetary relief against the federal defendants. However, in light of the unprecedented circumstances attendant upon the federal government's challenge, the court concludes that, while it may seek prospective injunctive and declaratory relief, the government may not recover equitable retroactive relief in any form since it does not come into court with clean hands. Furthermore, the court finds it altogether appropriate to require the United States agencies involved to work with the state agencies in devising a valid, objective selection process that will meet federal requirements.

*Selections from Certificates of Eligibles*

In challenging selections from certificates of eligibles, plaintiffs proceed under the "disparate treatment" theory of discrimination, under which they must prove that "the employer . . . treats some people less favorably than others because of their race . . . . Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere differences in treatment." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854 n.15, 52 L.Ed.2d 396, 415 n.15 (1977). Intent to discriminate may be proved solely by statistical evidence indicating gross disparities in the number of blacks hired. *Id.* at 339–40, 97 S.Ct. at 1856, 52 L.Ed.2d at 417–18. Upon such a showing, the burden shifts to defendants to demonstrate that the statistics relied on by plaintiffs are either "inaccurate or insignificant." *Id.* at 360, 97 S.Ct. at 1867, 52 L.Ed.2d at 430.

Dr. Kolesar's analyses in this regard are persuasive. While 37% of whites appearing on mixed certificates were hired, only 18% of blacks on those certificates were offered employment. This difference was so great that there was only one chance in 10,000 that a racially neutral process would have produced the disparities. In addition, a comparison of the frequency with which any selection was made from certificates containing only black applications to the frequency of selections from all-white certificates revealed a statistically significant disparity in favor of all-white certificates. For the three contested classes combined, someone was appointed from 78.4% of all-white certificates, compared to only 35.7% of all-black ones. Apart from this strong statistical showing, MSDPW had a history of employing few blacks as Clerk/Typists, Eligibility Workers and Social Workers.

Buttressing the statistical and historical evidence, however, is the testimony of named plaintiffs and class members regarding their experiences during this final selection phase. It is unnecessary at this phase of the trial to determine which of the indi-

viduals testifying will ultimately be entitled to relief, but we note that the subjective nature of the interview and recommendation process, conducted by all-white county directors, provided opportunity to discriminate in making employment decisions. *See Rowe v. General Motors Corp.*, 457 F.2d 348, 358 (5 Cir. 1972). Plaintiffs' evidence was more than ample to establish a prima facie case of class discrimination, to which the *Teamsters'* model of proof applies, *Markey v. Tenneco Oil Co.*, 635 F.2d 497, 499 (5 Cir. 1981), rather than the model for the single-plaintiff case established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See Payne v. Travenol Laboratories, Inc.*, 673 F.2d 798 at 817.

Defendants did not, in our view, rebut plaintiffs' prima facie case of discrimination in selections from certificates of eligibles. They did not show that plaintiffs' statistics were "inaccurate or insignificant." They do note, however, that from March 24, 1972, until October 31, 1974, 25% of all persons hired from mixed certificates of eligibles were black, which closely approximates the 29.6% black labor force. This comparison is faulty, however, in that it ignores the actual, and substantially larger, number of blacks appearing on certificates of eligibles, and disregards altogether hires from all-white and all-black certificates. Defendants also argue that the cause of the low numbers of blacks in the Department's workforce was due to pre-Act hiring, and not post-Act conduct, but this is contrary to the indisputable evidence regarding the large numbers of persons hired after the effective date of Title VII and the disparity in the number of blacks hired since that time. While defendants explained the bases of some selections, county directors did not testify, either convincingly or at all, as to their actions in continuously refusing to recommend for employment members of the plaintiff class testifying at trial.

Accordingly, we must conclude that the Department violated Title VII, 42 U.S.C. § 1981, 42 U.S.C. § 1983, and the fourteenth amendment in making selections from certificates of eligibles in such manner as to subject applicants to disparate treatment because of race.

We must now determine when the Department's illegal actions ceased, so that considerations of relief to class members may be properly focused. Although the Department's remedial actions taken after these suits were filed "could not erase its previous illegal conduct or its obligation to afford relief to those who suffered because of it," [19] it is clear that the Department no longer discriminates against blacks in selections from certificates of eligibles. Upon the cessation of written examinations and test scores in 1975, the use of certificates of eligibles did not long survive. As of July 1978, the time of trial, the Department had altogether ceased discrimination in selecting individuals for employment from certificates of eligibles. Indeed, given the large numbers of blacks presently employed in the contested classes, it is indisputable that discrimination no longer exists in Department hiring decisions.

■ The statute of limitations for §§ 1981 and 1983 actions is controlled by state law, and in Mississippi the general six year statute applies, Miss.Code Ann. § 15–1–49 (1972), *Truvillion v. Kings Daughter Hospital*, 614 F.2d 520 (5 Cir. 1980). Since the named plaintiffs have unquestioned standing to raise claims of disparate class treatment, class membership begins six years before the complaint was filed on January 15, 1973, or January 14, 1967. *Payne v. Travenol Laboratories, Inc., supra*, 673 F.2d at 815.

## SUMMARY

In summary, we hold:

1. The named plaintiffs lack standing to challenge the educational requirements and the government failed to prove that such requirements are racially discriminatory.

19. *Teamsters, supra*, at 342, 97 S.Ct. at 1858, 52 L.Ed.2d at 419.

2. The named plaintiffs represent two subclasses of black applicants, one subclass having claims of racial discrimination because of disparate impact caused by impermissible, unvalidated examinations and the other subclass having claims arising from disparate treatment in the recommendation and selection of black applicants from certificates of eligibles.

3. The plaintiff class is redefined as follows:

(a) A plaintiff subclass under Title VII consisting of all black applicants for the positions of Clerk/Typist, Eligibility Worker and Social Worker who were discriminated against by failing or otherwise being aggrieved by use of written examinations between the dates of March 24, 1972, and December 1, 1976; and

(b) A plaintiff subclass under Title VII, as well as §§ 1981 and 1983 and the fourteenth amendment, consisting of all black applicants for positions of Clerk/Typist, Eligibility Worker, and Social Worker who, after being ranked thereon for consideration, were discriminated against by being passed over or not hired from certificates of eligibles on account of their race, between the dates of January 15, 1967, and December 1, 1976.

4. The plaintiff class is entitled to declaratory and injunctive relief banning the use of unvalidated written examinations as a selection device for employment and prohibiting disparate treatment on account of race in the recommendation and selection of applicants for employment.

5. Members of the plaintiff class are entitled, presumptively, to backpay as well as attorney fees, expenses, costs of the action and such other remedial relief as the court may hereafter determine appropriate. Our judgment shall provide that MSDPW shall, within a specified time, submit to the court and counsel for the plaintiff class the names and last known addresses of all black applicants included within each plaintiff subclass, and shall provide for notice to class members for submission of backpay claims in accordance with approved procedures.

6. Liability for monetary relief, including backpay, attorney fees, expenses and other costs, is cast jointly and severally upon the Mississippi State Department of Public Welfare, its commissioner and board members in their official capacities, and the Mississippi State Classification Commission and its director in his official capacity.

7. The United States in its separate action is entitled to declaratory and injunctive relief prohibiting defendants from hereafter using unvalidated written examinations and racially discriminatory use of certificates of eligibles for selection devices for hiring employees in the position of Clerk/Typist, Eligibility Worker and Social Worker in MSDPW. Although the United States would ordinarily be entitled to recover backpay for applicants discriminated against at the certificate of eligibles stage of consideration, the court determines that this relief is unnecessary inasmuch as the rights of these individuals will be adequately protected by private plaintiffs in the companion case.

8. The cross-claim and counterclaim of state defendants are granted to the extent of providing injunctive relief against the Secretaries of the Departments of Health & Human Services and Agriculture and the Chairman of the Civil Services Commission to require them to withdraw as mandatory selection devices unvalidated written examinations and to furnish to appropriate state officials such financial, technical and advisory assistance as may be necessary to establish valid, minimum requirements for the contested positions.

Let separate judgments issue accordingly.